SUTTON, J., delivered the opinion of the court in which BOGGS, J., joined. STRANCH, J. (pp. 274-82), delivered a separate dissenting opinion.
OPINION
SUTTON, Circuit Judge.
At issue is whether several collective bargaining agreements entitle a class of retirees from Moen Inc. to vested healthcare benefits for life. The district court granted relief to the class based on UAW v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir.1983), and other Sixth Circuit decisions applying Yard-Man. In M & G Polymers USA LLC v. Tackett, — U.S.—, 135 S.Ct. 926, 190 L.Ed.2d 809 (2015), decided after the district court’s decision in this ease, the Court repudiated the Yardr-Man line of cases. Consistent with Tackett, we must reverse the district court’s decision.
I.
Between 1983 and 2005, Moen and its predecessor corporation entered into a series of (usually) three-year collective bargaining agreements (often called CBAs) with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its local affiliate. Each agreement offered two types of health-related benefits to individuals who retired from Moen’s plant in Ely-ria, Ohio: (1) hospitalization, surgical, and medical coverage and (2) Medicare Part B premium reimbursements, which compensated retirees for the expenses of participating in the federal government’s medical insurance program. Employees who retired between August 8, 1983, and March 1, 1996, along with their dependents, received “[cjontinued hospitalization, surgical and medical coverage ... without cost.” E.g., R. 52-11 at 42; R. 52-14 at 76. If the retirees were over age 65, the company also reimbursed the full cost of their Medicare Part B premiums, and it did the same' for retirees’ spouses over age 65. Employees who retired on or after March 1, 1996, along with their dependents, received hospitalization, surgical, and medical coverage upon payment of a co-premium. “The co-premium amount for the retiree,” the CBAs provided, “will be frozen- at the co-premium in effect at [the] time of retirement.” E.g., R. 52-15 at 37; R. 52-18 at 36. If over 65, these retirees (plus their over-65 spouses) received Medicare Part B premium reimbursements at specified rates.
The parties terminated the last CBA in 2008, when Moen shut down its Elyria operations. The UAW and its local affiliate entered into a “Closure Effects Agreement” with Moen, providing that healthcare coverage “shall continue” for retirees and their spouses “as indicated under the [final] Collective Bargaining Agreement.” R. 52-23 at 2, 7. The plant closed in December 2008.
After the plant closed, Moen continued to provide the same healthcare benefits to its retirees for a while. In March 2013, the company decreased the benefits available for retirees in response to “recent Medicare improvements” and “more effective supplemental benefit plans,” as well as the federal government’s imposition of an excise tax on high-cost “Cadillac plans” through the Patient Protection and Affordable Care Act, see 26 U.S.C. § 49801. R. 51-31 at 1; R. 52-30 at 5. After the changes, Medicare-eligible retirees no longer received healthcare coverage or Part B premium reimbursements, and the *268 company shifted non-Medicare-eligible retirees to a healthcare plan that required higher out-of-pocket payments.
Seven retirees and the UAW sued Moen in response. The retirees argued that their healthcare benefits had “vested” under the CBAs and the plant closing agreement, prohibiting Moen from changing their coverage. The district court certified a class of “all Moen healthcare benefits plan participants” who had retired from the Elyria plant and who were not covered by an earlier settlement agreement. R. 42 at 2. The class includes roughly 200 individuals. Both parties filed motions for summary judgment, and the district court granted the plaintiffs’ motion. Relying on Yard-Man, the court concluded that the CBAs and the plant closing agreement required Moen to offer the same healthcare benefits to the retirees for life. The court also granted $776,767.19 in attorney's fees and costs to the plaintiffs. Moen appealed.
II.
M & G Polymers USA, LLC v. Tackett, — U.S.—, 135 S.Ct. 926, 190 L.Ed.2d 809 (2015), orients this appeal. In reversing a decision from our court, the Supreme Court instructed us to interpret collective bargaining agreements “according to ordinary principles of contract law.” Id. at 933. The Court then instructed us what not to do in applying these principles. It repudiated Yard-Man and its heirs, directing us not to “plac[e] a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements.” Id. at 935. It rejected our prior “inferences” in favor of vesting healthcare benefits for life as “too speculative and too far removed from the context of any particular contract to be useful in discerning the parties’ intention.” Id. It rejected our prior assumption that “retiree health care benefits are not subjects of mandatory collective bargaining,” pointing out that parties frequently “voluntarily agree” to bargain about retiree healthcare. Id. at 936. It rejected our “premise that retiree benefits are a form of deferred compensation,” reminding us that Congress has rejected that premise. Id.; see 29 U.S.C. § 1002(1), (2)(A)(ii). It directed us to consider the general durational clauses in the CBAs (usually three years) in deciding how long a company has committed to provide healthcare benefits to retirees. 135 S.Ct. at 936. It told us that “courts should not construe ambiguous writings to create lifetime promises.” Id. And it explained that, “when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life.” Id. at 937; see generally Tackett v. M & G Polymers USA, LLC, No. 12-3329, 811 F.3d 204, 208, 2016 WL 240414, at *4 (6th Cir. Jan. 21, 2016).
The Court offered one more piece of guidance. At the same time it rejected Yard-Man, it endorsed our decision in Sprague v. General Motors Corp., 133 F.3d 388 (6th Cir.1998) (en banc). Sprague rejected the application of Yardr-Man in the context of noncollectively bargained contracts about retiree healthcare benefits and refused to infer from silence and ambiguous contracts a commitment to unalterable healthcare benefits to retirees for life. Id. at 400. Tackett thus directed us to treat collectively and noncollectively bargained contracts about retiree healthcare benefits similarly — to apply the same basic rules of contract interpretation to both sets of contracts. See 135 S.Ct. at 936-37.
Guided by the Court’s directives about what to do and what not to do in this area, we must conclude that the MoenUAW collective bargaining agreements do *269 not provide unalterable healthcare benefits for life to the Elyria retirees and their dependents. Here are the key provisions of the 2005 CBA, similar in relevant part to the earlier CBAs:
Continued hospitalization, surgical and medical coverage will be provided without cost to past pensioners and their dependents prior to March 1,1996.
Effective March 1, 1996, future retirees will be covered under the new medical plan. The co-premium amount for the retiree will be frozen at the co-premium in effect at time of retirement.
Future retirees as of [January 1999] will be reimbursed for Medicare Part B for employee and spouse at Medicare Part B $45.50/$91.00.
R. 52-18 at 36.
First and foremost, nothing in this or any of the other CBAs says that Moen committed to provide unalterable healthcare benefits to retirees and their spouses for life. That is what matters, and that is where the plaintiffs fall short. Tackett directs us to apply ordinary contract principles and not to tilt the inquiry in favor of vesting — a frame of reference that prompts two questions. What is the contract right that the plaintiffs seek to vindicate? And does the contract contain that right? The plaintiffs claim a right to healthcare benefits for life. But the contracts never make that commitment. Yes, Moen offered retirees healthcare benefits. And yes Moen, like many employers, may have wished that business conditions and stable healthcare costs (hope springs eternal) would permit it to provide similar healthcare benefits to retirees throughout retirement. But the question is whether the two parties signed a contract to that effect. Nothing of the sort appears in the collective bargaining agreements. See Tackett, 135 S.Ct. at 937.
Second, not only do the CBAs fail to say that Moen committed to provide unalterable healthcare benefits for life to retirees, everything they say about the topic was contained in a three-year agreement. If we do not expect to find “elephants in mouseholes” in construing statutes, see Whitman v. Am. Trucking Ass’ns, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001), we should not expect to find lifetime commitments in time-limited agreements, Tackett, 135 S.Ct. at 936. Each of the CBAs made commitments for approximately three-year terms — well short of commitments for life. Present in each CBA, the general durational clause supplied a concrete date of expiration after which either party could terminate the agreement. When a specific provision of the CBA does not include an end date, we refer to the general durational clause to determine that provision’s termination. Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 207, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991). Absent a longer time limit in the context of a specific provision, the general durational clause supplies a final phrase to every term in the CBA: “until this agreement ends.” See id.; see also Tackett, 135 S.Ct. at 936. Reading the healthcare provisions in conjunction with the general durational clause gives meaning to the phrases “[c]ontinued,” “will be provided,” “will be covered,” and the like. These terms guarantee benefits until the agreement expires, nothing more. See UAW v. Skinner Engine Co., 188 F.3d 130, 141 (3d Cir.1999); Senn v. United Dominion Indus., Inc., 951 F.2d 806, 816 (7th Cir.1992).
Consistent with traditional contract interpretation principles and with prior precedents of the Supreme Court, “contractual obligations will cease, in the ordi *270 nary course, upon termination of the bargaining agreement.” Litton, 501 U.S. at 207, 111 S.Ct. 2215. Any other approach, Tackett explained, “distort[s] the text” of CBAs by “refus[ing] to apply general durational clauses to provisions governing retiree benefits.” 135 S.Ct. at 936. Because “the written agreement is presumed to encompass the whole agreement of the parties,” id., and because Congress has placed special emphasis on the “written terms” of retiree healthcare plans, id. at 933 (quotation omitted); see 29 U.S.C. § 1102(a)(1), we must enforce those terms as written. See Heimeshoff v. Hartford Life & Accident Ins. Co., — U.S. —, 134 S.Ct. 604, 611-12, 187 L.Ed.2d 529 (2013).
Third, each of the last three CBAs says that “[cjontinued hospitalization, surgical and medical coverage will be provided without cost to past pensioners and their dependents prior to March 1, 1996.” E.g., R. 52-16 at 39 (emphasis added). Consistent with the three-year term of these CBAs, the language provides “continued” healthcare benefits to “past pensioners”— namely, former employees who retired under prior CBAs. There would be no need to “continue” such benefits if prior CBAs had created vested rights to such benefits. And indeed no comparable language appears in the CBA provisions dealing with pension benefits that vested under prior agreements.
Fourth, while the authors of the CBAs opted not to say that retiree healthcare benefits were vested for life, they explicitly vested pension benefits for qualifying retirees. The difference in language demands a difference in meaning. “It is understood that when [certain] benefits are no longer payable,” each CBA provides, “the normal monthly survivor pension benefit will be paid for the rest of the survivor’s life.” E.g., R. 52-18 at 34. Because a contract “should be read to give effect to all its provisions and to render them consistent with each other,” Mastro-buono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), we must assume that the explicit guarantee of lifetime benefits in some provisions and not others means something. See Skinner, 188 F.3d at 144. The absence of vesting language in the CBAs becomes even starker when we look at the pension plan itself, which defines a “Five Year Certain and Life Annuity” as “[a] series of monthly payments for the life of the Participant ” and a “Qualified Joint and Survivor Annuity” as “[a]n annuity for the life of the Participant with a survivor annuity for the life of his spouse.” R. 52-11 at 11, 14 (emphasis added). No such language appears in the CBA provisions dealing with healthcare benefits.
Fifth, the agreements contain reservation-of-rights clauses that evidence an intent not to vest and that apply to employees and retirees. “The Company,” one such clause says, “shall have the right to amend, cancel or reinsure the policies or change the underwriters thereof, so long as [specified] benefits are maintained for the life of this Agreement^]” R. 52-18 at 33. How can one simultaneously say that healthcare benefits are “vested” but may be “canceled]” by the employer? Even the caveat — that certain “benefits” must be “maintained” — applies only “for the life of this Agreement,” a timeline that is incompatible with construing the agreement to create vested and unalterable benefits. And although the reservation-of-rights clause comes in a paragraph discussing employee benefits, it does not limit itself to those benefits. It instead refers to Moen’s right to cancel the insurance “policies,” which — as other sections of the CBAs demonstrate — covered employees and retirees. The CBAs, moreover, sometimes *271 use the word “employee” to refer to both employees and retirees. The article that provides for retiree health insurance begins by stating that “[b]enefits described in this article apply to all employees,” and a table outlining retiree co-premiums lists the contributions required by “[e]mployee” and “[e]mployee + 1.” Id. at 33, 36 (emphasis added).
Sixth, these principles yield a similar conclusion when applied to the plant closing agreement. “Healthcare ... and related benefits shall continue under Article XVTI [of the CBA],” the contract says, “for all retirees and spouses as indicated under the Collective Bargaining Agreement.” R. 52-23 at 7 (emphasis added). Although this provision does not specify which CBA it refers to, we presume (and the parties agree) that the relevant CBA is the final one, the 2005 agreement. The most natural reading of the plant closing contract is that it offers the same benefits under the same conditions as the 2005 CBA. Because a right to permanent healthcare benefits did not vest under that CBA, it did not vest under the plant closing agreement either.
Seventh, the above analysis not only respects the language of the relevant agreements and Tackett, but it also brings our court into alignment with other circuits around the country. No court to our knowledge has found, or would find, a promise of lifetime unalterable healthcare benefits based on CBA language of this sort in a time-limited agreement. See Senior v. NSTAR Elec. & Gas Corp., 449 F.3d 206, 218-19, 224 (1st Cir.2006); Joyce v. Curtiss-Wright Corp., 171 F.3d 130, 134-35 (2d Cir.1999); Skinner, 188 F.3d at 141-44; Gable v. Sweetheart Cup Co., 35 F.3d 851, 854-56 (4th Cir.1994); Nichols v. Alcatel USA Inc., 532 F.3d 364, 377-78 (5th Cir.2008) (preliminary injunction); Senn, 951 F.2d at 814-16; Anderson v. Alpha Portland Indus., Inc., 836 F.2d 1512, 1516-20 (8th Cir.1988); Bazzone v. Auto. Indus. Welfare Fund, 860 F.2d 1088, at *2-5 (9th Cir.1988) (unpublished table disposition).
The plaintiffs offer several contrary arguments. They point out that the CBAs state that “[c]ontinued” coverage “will be provided”; that future retirees “will be covered”; that co-premiums “will be frozen”; that “[p]ension payments will be increased by the amount of current Medicare charges”; and that the employer “will pay the monthly premium charge” for retirees’ health insurance. E.g., R. 52-13 at 81; R. 52-18 at 36 (emphasis added). If Tackett tells us anything, however, it is that the use of the future tense without more — without words committing to retain the benefit for life — does not guarantee lifetime benefits. 135 S.Ct. at 937. The relevant provisions offer healthcare coverage until some point in the future, but they do not say what that point is.
The plaintiffs invoke provisions in the CBAs that include specific durational limits, claiming that the absence of a comparable limit in the retiree healthcare provisions shows that the parties intended the commitment to last for life. The 2005 CBA, for example, says that “Hospitalization, Surgical and Medical Benefits for terminated employees, including lay-off, will continue in effect for the duration of the month for which premiums have been paid, except as [specified in another provision].” R. 52-18 at 35. The absence of specific durational limits in the retiree benefits provisions, argue the plaintiffs, means that these benefits were meant to last for life. But specific and general terms usually work in tandem, and that is just the case here. The CBAs’ general durational clauses provide a baseline or default rule, a point at which the agreements expire absent more specific limits relevant to a *272 particular term. In the absence of specific language in the retiree healthcare provisions, the general durational clause controls.
Referring to some of our Yardr-Man cases, the plaintiffs note that we have inferred that retiree healthcare benefits vest when CBAs tie eligibility for retiree healthcare benefits to eligibility for pensions. See, e.g., Noe v. PolyOne Corp., 520 F.3d 548, 558-59 (6th Cir.2008); McCoy v. Meridian Auto. Sys., Inc., 390 F.3d 417, 422 (6th Cir.2004). The CBAs at issue do just that, they add, in two ways. They first provide that “[ejontinued hospitalization, surgical and medical coverage will be provided without cost to past pensioners and their dependents,” e.g., R. 52-18 at 36 (emphasis added), rather than using a more generic term like “past employees.” And some of the agreements provide Medicare Part B reimbursements by increasing retirees’ pension payments. But Tackett rejected this kind of “tying” analysis as a relic of a misdirected frame of reference, calling it one of many YardMan inferences that was “inconsistent with ordinary principles of contract law.” 135 S.Ct. at 937. Even the concurrence, which addressed the tying analysis in greater detail, stated only that tying language could shed light on the parties’ intent when it connected the duration of pensions to the duration of health benefits (e.g., “[RJetirees ‘will receive’ health-care benefits if they are ‘receiving a monthly pension’ ”). Id. at 938 (Ginsburg, J., concurring) (emphasis added). That sort of durational linkage is absent here, where the CBAs simply state that those who are eligible for pensions are also eligible for health benefits. It is not surprising that CBAs address pension and healthcare benefits for retirees. And it is not surprising that the CBAs make pensioner status a condition of receiving healthcare benefits. But neither one of these features of the CBAs means that retirees will get those benefits for as long as they earn a pension, particularly since the pension provisions use vesting language and the healthcare provisions do not.
Moving beyond the language of the agreements, the plaintiffs claim that each CBA incorporates background understandings that favor lifetime vesting ,of retiree healthcare benefits. At the time the parties negotiated each CBA, plaintiffs note, Yard-Man governed and thus the parties would have assumed that those inferences (and the unalterable lifetime healthcare benefits that go with them) would have applied. The short answer is that this new inference about prior assumptions would have been just as true in Tackett — a case from our circuit that involved a collective bargaining agreement negotiated when Yard-Man remained good law. And yet nothing in Tackett (or the concurrence) hints at the idea that Yardr-Man would linger, vest as it were, as a precedent that would bind future interpretations of such agreements. This theory of background understandings also sits at a lofty level of generality, one that, if accepted, might have to account for other ever-uncertain assumptions about the future. Would healthcare costs rise at the same pace as general inflation or would they far exceed it? Would the National Government enact a national healthcare law? And, if so, would that new law impose a tax on generous, so-called Cadillac healthcare plans? Nor is it fair to assume that all parties who entered such CBAs were certain about the fate of Yard-Man. That explains why our court upheld substantial class-action settlements between Ford and the UAW and General Motors and the UAW that were premised in part on uncertainty about the future of Yardr-Man. UAW v. Gen. Motors Corp., 497 F.3d 615, 631-32 (6th Cir.2007). That uncertainty *273 was not unwarranted. No court of appeals in the country applied our Yard-Man inferences. And even this court refused to apply the inferences in the context of contracts that were not the subject of collective bargaining, see Sprague, 133 F.3d at 400 — what had always been a strangely inverted regime that favored employees who had the benefit of union representation over those without it, Rossetto v. Pabst Brewing Co., 217 F.3d 539, 543-44 (7th Cir.2000).
The plaintiffs also make several arguments related to the plant closing agreement. They begin by pointing to the agreement’s promise that healthcare benefits “shall continue,” noting that the contract includes neither a general nor a specific durational clause that might limit the period of continuation. But this argument ignores the context of the relevant language, which states that healthcare benefits “shall continue ... as indicated under the [2005] Collective Bargaining Agreement.” R. 52-23 at 7 (emphasis added). The contract thus did not need explicit durational language because it incorporated the terms of the 2005 CBA, which did not provide for vested benefits.
But, the plaintiffs persist, doesn’t this interpretation make the “shall continue” clause redundant? An earlier provision of the plant closing agreement provided that “[a]ll terms and conditions of the 2005-2008 Collective Bargaining Agreement shall remain in effect until all bargaining unit employees cease working at the facility.” Id. at 2. If the contract already provided that the 2005 CBA would govern until the last unionized employee left, then it would not have been necessary to include an additional provision stating that benefits “shall continue” for as long as the 2005 CBA permits. But the rule that courts should interpret contracts to avoid superfluous words is a “tool[ ] for dealing with ambiguity, not a tool for creating ambiguity in the first place.” TMW Enters., Inc. v. Fed. Ins. Co., 619 F.3d 574, 578 (6th Cir.2010). Because the phrase “as indicated under the Collective Bargaining Agreement” is unambiguous, there is no reason to invoke an interpretive canon that would convert a clear phrase into a misty one. That is particularly true when the plaintiffs’ interpretation does nothing to reduce the alleged redundancy. If, as the plaintiffs claim, the CBAs already vested healthcare benefits, there was no need to provide for the continuation of those benefits in the plant closing agreement at all.
The plaintiffs point to two cases to support their reading of the plant closing contract, but both are inapposite. The plant closing agreements in Temme v. Bemis Co., 622 F.3d 730, 733, 736-37 (7th Cir.2010), and Zielinski v. Pabst Brewing Co., 463 F.3d 615, 616-18 (7th Cir.2006), did not incorporate the time limits of previous CBAs — and, to the extent they impliedly incorporated such limits, the language of the earlier CBAs was itself consistent with vesting. The problem here is that the final CBA does not offer vested benefits, meaning that an agreement that incorporates it by reference does not do so either.
The plaintiffs point to extrinsic evidence, such as the fact that Moen continued paying healthcare benefits for five years after the plant closing agreement expired, claiming that this shows the parties’ “inten[t]” to create vested and unalterable retiree healthcare benefits. Appellees’ Br. 57. Two responses. The first and best way to divine the intent of the parties is from the four corners of their contract and from traditional canons of contract interpretation. That language and these canons offer no evidence of any intent to fix these benefits permanently into the future. Absent ambiguity from *274 this threshold inquiry, no basis for going beyond the contract’s four corners exists. See Witmer v. Acument Global Techs., Inc., 694 F.3d 774, 778 (6th Cir.2012). At any rate, a company does not act inconsistently when (1) it continues paying healthcare benefits to retirees and (2) reserves the right to alter or eliminate those benefits in the future. That a company to its credit hopes to subsidize healthcare benefits for its retirees for as long as possible does not mean it has promised to do so, and above all such action does not mean that it has no right to alter those benefits in the future to account for changes to its healthcare plans for employees or, as here, to account for new federal legislation.
One other point. Moen argues that Tackett creates a clear-statement rule— that, before a retiree may impose a duty on a company to provide vested and unalterable healthcare benefits, it must satisfy the rigors of clarity associated with waivers of sovereign immunity and the like. See United States v. Nordic Vill., Inc., 503 U.S. 30, 33-34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). But clear-statement rules of this sort generally come into play after courts deploy the customary rules of interpretation. See id. at 34-37,112 S.Ct. 1011; Gregory v. Ashcroft, 501 U.S. 452, 464-67, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991); Dellmuth v. Muth, 491 U.S. 223, 227-32, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989). Only at that point do courts ask whether the parties or the legislature, as the case may be, has clearly/expressly/plainly created the duty at issue and only at that point .do they establish a default rule in favor of or against certain outcomes or policies.
Tackett does not create such a rule. It tells courts to apply “ordinary principles of contract law” — identifying relevant principles in this setting along the way — and tells courts to follow those principles where they lead. 135 S.Ct. at 933. That approach of course still permits courts to draw implications and inferences from the language of the contract. Interpretation always requires the reader to take signals from the writer in one way or another. When contracting parties say one thing in a part of the contract and say something else in a related section, to use one example, they imply a difference in meaning. And when readers see a benefit created in a three-year contract, to use another, they are entitled to infer that any right to the benefit ends after three years. In overruling Yard-Man, in short, Tackett does not create a clear-statement rule in the other direction. It instead eliminates the use of inferences and implications not grounded in “ordinary principles of contract law” and explains the kinds of tools properly deployed in this setting. As applied to this set of contracts, those principles require the conclusion that no vesting occurred.
III.
Moen also challenges the district court’s award of attorney’s fees and costs. Because we reverse the district court’s judgment, we vacate its fee award too. See Reese v. CNH Am. LLC, 574 F.3d 315, 328 (6th Cir.2009).
IV.
For these reasons, we reverse the district court’s grant of summary judgment, vacate the attorney’s fee award, and remand the case for the district court to enter judgment for the defendant.