RONALD LEE GILMAN, Circuit Judge,
dissenting.
The 1998 Collective Bargaining Agreement (CBA) between Kelsey-Hayes and the UAW provides that healthcare benefits “shall be continued for such employees who retire ...” Reasonable jurists could conclude that the quoted language is ambiguous, thus allowing them to look at extrinsic evidence in order to ascertain its meaning. On the other hand, reasonable jurists could just as easily conclude that the quoted language is unambiguous when read in conjunction with the CBA’s general durational clause and the Supplement H durational clause, thus precluding any reference to the extrinsic evidence. Our need — indeed, our authority — to weigh in on this issue is obviated by this court’s recent decision in Gallo v. Moen, Inc., 813 F.3d 265 (6th Cir. 2016), cert. denied, — U.S. -, 137 S.Ct. 375, 196 L.Ed.2d 293 (2016), which determined that materially indistinguishable language was unambiguous. Because I believe that the outcome of the case before us is controlled by Gallo, I respectfully dissent.
Tackett instructs us to apply “ordinary principles of contract law” in interpreting CBAs. M & G Polymers USA, LLC v. Tackett, — U.S. -, 135 S.Ct. 926, 933, 190 L.Ed.2d 809 (2015). Among those principles is the rule that “when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life.” Id. at 937. On remand, this court in Tackett v. M & G Polymers USA, LLC, 811 F.3d 204, 208-09 (6th Cir. 2016) (Tackett III), noted several additional principles of contract law, including the well-established rule that extrinsic evidence should be consulted to determine the intent of the parties only when the contract language is ambiguous. Id. at 208-09.
Although Tackett III expounds on a number of guiding principles for the interpretation of CBAs, its holding was simply to remand the case back to the district court with instructions to interpret the CBA in accordance with those principles. Id. at 210. Much of Tackett Ill’s language is therefore dicta because the discussion of *874 contract principles was not necessary to the remand ruling. See Coca-Cola Co. v. Procter & Gamble Co., 822 F.2d 28, 30 (6th Cir. 1987) (defining dicta as portions of an opinion that are “not essential to the court’s holding” and therefore “not binding precedent”).
This court, however, did have an opportunity to apply these ordinary contract principles to a specific CBA in Gallo. The Gallo court applied the principles to conclude that the CBA in that case unambiguously did not vest retiree healthcare benefits for life. Gallo, 813 F.3d at 273-74. And despite the majority’s few paragraphs that attempt to distinguish Gallo from the present case, Gallo cannot so easily be swept under the rug.
Gallo is in fact legally indistinguishable from the present case. The Gallo court faced an identical issue: whether a series of CBAs entitled a class of retirees to lifetime healthcare benefits. In Gallo, the CBA contained terms stating that healthcare benefits for retirees “will be provided,” “will be covered,” and would “[e]on-tinue.” Id. at 269. These provisions were determined not to be specific enough to override the CBA’s general durational clause and, therefore, the healthcare benefits did not vest for life. Id. The court held that “absent a longer time limit in the context of a specific provision, the general durational clause supplies a final phrase to every term in the CBA.” Id. In making that determination, this court did not look “beyond the contract’s four corners” and ruled that, because the contract was unambiguous, the consideration of extrinsic evidence was inappropriate. Id. at 274.
Much like the CBA at issue in Gallo, the 1998 CBA here specified that healthcare benefits “shall be continued” for retirees and provided for the “continuance” of healthcare coverage for retired employees and their surviving spouses. No specific expiration date for these benefits was contained in these clauses. The 1998 CBA, however, contained a general durational clause, which provided that the CBA terminated on February 1, 2002. Supplement H, which dealt with insurance benefits generally, also specifically adopted this provision through its own durational clause. The Supplement H durational clause specified that the healthcare benefits detailed in Supplement H-l “shall continue in effect until the termination of the CBA in which this is a part.” These dura-tional clauses give meaning to the promise that healthcare benefits “shall continue.” That is, the terms “shall be continued” and “continuance” serve to guarantee healthcare benefits until the 1998 CBA 'expired, nothing more. See id. at 269.
The majority asserts that, despite these similarities, two factual distinctions mandate a conclusion different from the one arrived at in Gallo. First, the majority contends that a reading of the “whole instrument” leaves ambiguous what the parties intended the duration of healthcare benefits to be “should the entire agreement be terminated except for the healthcare benefits.” (Maj. Op. 871) Indeed, the 2001 Plant Closing Agreement (PCA) terminated the 1998 CBA and released Kelsey-Hayes from all obligations except for those specifically excepted from termination and release. The obligations concerning retiree healthcare were among those not released under the PCA, but were instead to be continued under the “applicable law and benefit plans (including those provisions contained in collective bargaining agreements).” These healthcare benefits therefore continued for the retirees under the terms of Supplement H of the 1998 CBA. The majority claims that the 1998 CBA and the 2001 PCA are inconsistent and thus render the duration of the healthcare benefits ambiguous.
*875 I respectfully disagree. Not only is there no inconsistency, but this very scenario was actually addressed and resolved in Gallo. The CBA at issue in Gallo had similarly been terminated by a plant closing agreement. This plant closing agreement provided that “[h]ealthcare ... and related benefits shall continue ... for all retirees and spouses as indicated under the Collective Bargaining Agreement.” Id. at 271 (emphasis in original). The Gallo court concluded that “[t]he most natural reading of the plant closing contract is that it offers the same benefits under the same conditions as the [previous] CBA.” Id. (emphasis in original). According to the court, the plant closing agreement “did not need explicit durational language because it incorporated the terms of the [previous] CBA, which did not provide for vested benefits.” Id. at 273.
In the present case, the 2001 PCA similarly terminated the 1998 CBA while continuing healthcare benefits for retirees under the “applicable law and benefit plans (including those provisions contained in collective bargaining agreements).” This means that the retirees’ healthcare benefits were unambiguously still governed by the terms of Supplement H and its dura-tional clause. The only effect of the PCA on these benefits, therefore, is that they continued through February 1, 2002, which was the expiration date supplied by the 1998 CBA’s general durational clause and adopted by Supplement H.
Second, the majority tries to distinguish this case from Gallo by noting that the 1998 CBA used “three different types of durational language for specific provisions.” (Maj. Op. 872) These clauses are: (1) the “shall be continued” and “continuance” language in the healthcare provisions, (2) provisions, such as those detailing healthcare benefits during layoffs, that guarantee benefits for specific periods of less than life, and (3) provisions explicitly providing pension benefits for life. Contrary to the majority’s assertions, the use of these different durational clauses does not cause any ambiguity. In fact, the CBA at issue in Gallo also contained provisions vesting certain benefits for life, yet the court held that these lifetime durational provisions actually rendered the healthcare provisions unambiguous. Id. at 270.
Ordinary principles of contract law demand that a contract “should be read to give effect to all its provisions and to render them consistent with each other.” Id. (quoting Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995)). As in Gallo, we must therefore “assume that the explicit guarantee of lifetime benefits in some provisions and not others means something.” Id. The explicit guarantee in the 1998 CBA of certain benefits for life and for specific periods of less than life for other benefits indicates that Kelsey-Hayes and the UAW could have included similar provisions when negotiating healthcare benefits. Instead, they simply provided that these benefits “shall be continued.”
This “difference in language demands a difference in meaning.” See id. The difference has to be that the healthcare benefits were meant to continue for some period less than the lifetime of the retirees. As precisely put in Gallo, “[i]f Tackett tells us anything, ... it is that the use of the future tense without more — without words committing to retain the benefit for life— does not guarantee lifetime benefits.” Id. at 271. In fact, Supplement H explicitly adopts the termination date of the 1998 CBA.
The majority asserts that my dissent “takes our opinion in Gallo too far.” (Maj. Op. at 872) But I fail to see how, since ordinary contract principles support Gallo’s holding that we should not infer lifetime benefits when, absent a specific *876 carve-out, there is a general' durational clause in the CBA. My analysis is thus based on a general principle of contract law, not on a “reverse Yard-Man presumption.”
Nor am I creating an unnecessary conflict with this court’s decision in Tackett III. In fact, I agree with the majority’s conclusion that “nothing in Gallo precludes looking to extrinsic evidence, consistent with Tackett and Tackett III, where the CBA is ambiguous as to the duration of healthcare benefits.” (Maj. Op. at 872) What Gallo does preclude, however, is a finding that the 1998 CBA between Kelsey-Hayes and the UAW is ambiguous. Gallo applied ordinary contract principles to the CBA before it to conclude that the healthcare benefits were unambiguously not vested for life. Because the facts of this case are materially indistinguishable, I see no way to avoid arriving at the same conclusion.
Gallo’s holding and my interpretation of the 1998 CBA are further supported by the Supreme Court’s endorsement of this court’s earlier holding in Sprague v. General Motors Corp., 133 F.3d 388 (6th Cir. 1998). See Tackett, 135 S.Ct. at. 937. Sprague dealt with the vesting of retiree healthcare benefits in the context of non-collectively bargained contracts. Sprague, 133 F.3d at 392-93. The Sprague court held that an employer’s commitment to vest lifetime healthcare benefits should not be inferred lightly and that “the intent to vest must be found in the plan documents and must be stated in clear and express language.” Id. at 400. In Tackett, the Supreme Court cited Sprague to underscore Yard-Man’s “deviation from ordinary principles of contract law,” such as the principle that “courts should not construe ambiguous writings to create lifetime promises.” Tackett, 135 S.Ct. at 936-37. The comparison of Sprague’s “clear and express” requirement with the YardMan inference that was rejected by the Supreme Court logically leads to the conclusion that the Tackett Court endorsed this court’s approach in Sprague. And here, of course, there is no clear and express vesting of lifetime healthcare benefits in the 1998 CBA.
In my opinion, this leaves the majority with nothing more than its point that Kelsey-Hayes’ management has made statements over the years that contradict its current position that retiree healthcare benefits are not vested for life. (See Maj. Op. 869-71). This would be a strong argument if we were free to conclude that the 1998 CBA was ambiguous as to the duration of retiree healthcare benefits. But for the reasons stated above, I believe that we are bound by Gallo’s determination that materially indistinguishable language regarding such benefits is unambiguous, thus precluding the consideration of all the extrinsic evidence proffered by the UAW. See Gallo, 813 F.3d at 273 (holding that “[t]he first and best way to divine the intent of the parties is from the four corners of their contract and from traditional canons of contract interpretation”); see also Salmi v. Sec’y of Health & Human Servs., 774 F.2d 685, 689 (6th Cir. 1985) (holding that “[a] panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.”).
One final thought. Although legally irrelevant, I must confess that I have been puzzled by the apparent disconnect between the language in the 1998 CBA that does not promise lifetime healthcare benefits and the extrinsic evidence to the contrary. I believe that the answer to the puzzle lies in the very fact that retiree *877 healthcare benefits were a feature in every CBA between the parties for over six decades. The parties, in other words, simply assumed that the benefits would continue for life because neither side anticipated the upheaval in the automotive industry or had any reason to think that any future CBA would alter the pattern of the past 60 years. This likely led to “loose talk” about lifetime healthcare benefits, with no one feeling the need to articulate the implied caveat that these benefits, like all employee benefits not explicitly vested for life, were dependent on the existence of a current CBA between Kelsey-Hayes and the UAW.
In any event, I believe that our decision in this case is controlled by Gallo, whether or not my musing about the nature of the extrinsic evidence is correct. I therefore respectfully dissent.