DISSENT
SUTTON, Circuit Judge,
dissenting.
In a 9-0 decision reversing our court in M & G Polymers USA, LLC v. Tackett, the Supreme Court asked us to do two things: (1) to interpret collective bargain *888 ing agreements “according to ordinary-principles of contract law,” and (2) to stop using the extraordinary Yard-Man “inferences,” which had “placfed] a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements.” — U.S. -, 135 S.Ct. 926, 933, 935, 190 L.Ed.2d 809 (2015). With the unanimous overruling of UAW v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir. 1983), those twin directives became one: apply normal rules of contract interpretation to promises with respect to healthcare benefits.
Because our court had long insisted that the Yard-Man inferences sprang from ordinary contract law, the Supreme Court proceeded to guide us about what counts as an ordinary contract principle and what does not. The Court told us to respect “general durational clauses” in collective bargaining agreements, reminded us that “courts should not construe ambiguous writings to create lifetime promises,” and directed us that, “when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life.” Id. at 936-37.
These principles should make quick work of this case. In this collective bargaining agreement, the company never promised to provide healthcare benefits for life, and the agreement contained a dura-tional clause that limited all of the benefits and burdens of the contract (not otherwise extended or shortened) to the six-year term of the agreement. In every other circuit in the country, that would end this case. The durational clause would control, and the healthcare benefits would last as long as the durational clause said they would.
Not here. The court concludes that the company made a lifetime commitment to provide healthcare benefits as a matter of law. Is this the application of “ordinary principles of contract law”? I am dubious. I know of no other area of contract law in which an agreement’s promises, subject to an uncontradicted durational clause, could be found ambiguous as to their duration— and then interpreted to last for life. The court’s approach to this contract is ordinary only in this circuit and only in ways that contradict the Supreme Court’s unambiguous directives about how to interpret such contracts. I respectfully dissent.
Several ordinary contract principles tell us how to resolve this case. One says that the four corners of the collective bargaining agreement are a good place to start. “Because ‘the written agreement is presumed to encompass the whole agreement of the parties,’ and because Congress has placed special emphasis on the ‘written terms’ of retiree healthcare plans, we must enforce those terms as written.” Gallo v. Moen Inc., 813 F.3d 265, 270 (6th Cir. 2016) (quoting Tackett, 135 U.S. at 936, 933, 10 S.Ct. 972), cert. denied, — U.S. -, 137 S.Ct. 375, 196 L.Ed.2d 293 (2016); see also 29 U.S.C. § 1102(a)(1). In this instance, the key is what the agreement does and does not say. It never promises lifetime healthcare benefits. What is written are two things: a specific promise of retiree healthcare benefits and a general durational clause that ends the entire agreement on “May 2, 2004.” That means the benefit lasts as long as the commitment — until May 2, 2004.
Reinforcing that conclusion is another traditional principle. “[Contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement.” Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 207, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991); see Tackett, 135 S.Ct. at 937. This agreement does not contain any written terms saying that healthcare benefits are excepted from the dura-tional clause. Just the opposite: The agreement says that the Group Benefit *889 Plan “will run concurrently with this Agreement and is hereby made a part of this Agreement.” R. 439-4 at 45 (emphasis added). The durational clause, and the absence of any provision setting a time frame for healthcare benefits, is all anyone needs to know to decide this case. The benefits do not last beyond May 2, 2004, because the agreement did not promise them beyond that date. Any other approach to the issue, Tackett explained, “distort[s] the text” of the agreement by “refus[ing] to apply general durational clauses to provisions governing retiree benefits.” 135 S.Ct. at 936.
A third principle cements this conclusion. “[W]hen a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life.” Id. at 937. In this case, the healthcare-benefits promise is silent as to the length of the commitment, and the agreement contains an expiration date of six years. That means the promise ends on May 2, 2004, unless and until the parties agree to extend it in the next collectively bargained agreement (just as they had so often done in the past).
Last but not least is this: Even if there were no durational language, even in other words if there were no six-year limit to the agreement, we still could not construe this -agreement’s commitments as lifetime promises. “[T]he traditional principle,” Tackett noted, is “that courts should not construe ambiguous writings to create lifetime promises.” Id. at 936. “[Cjontracts that are silent as to their duration will ordinarily be treated not as ‘operative in perpetuity’ but as ‘operative for a reasonable time.’ ” Id. (quoting 3 A. Corbin, Cor-bin on Contracts § 553, p. 216 (1960)).
These principles should resolve this case. And they would resolve this case in every other circuit in the country. Before Tackett, ours was the only circuit that applied a presumption in favor of treating healthcare benefits as promises for life. See Noe v. PolyOne Corp., 520 F.3d 548, 568 (6th Cir. 2008) (Sutton, J., concurring in part and dissenting in part). The other circuits applied the just-mentioned rules of interpretation to contracts just like this one, confirming that these rules are indeed “ordinary,” and thus respected the dura-tional clauses in each of them. See, e.g., Senior v. NSTAR Elec. & Gas Corp., 449 F.3d 206, 218 (1st Cir. 2006); Joyce v. Curtiss-Wright Corp., 171 F.3d 130, 134 (2d Cir. 1999); UAW v. Skinner Engine Co., 188 F.3d 130, 140 (3d Cir. 1999); Rossetto v. Pdbst Brewing Co., 217 F.3d 539, 543 (7th Cir. 2000); see also Raymond A. Franklin, Note, Vesting Retirement Benefits: Revisiting Yard-Man and Its Unacknowledged Presumption, 25 J. Civ. Rts. & Econ. Dev. 803, 821-22 (2011). After Tackett, unsurprisingly, the other courts of appeals continue to enforce general dura-tional clauses in similar agreements — including a unanimous Fourth Circuit decision from just a few weeks ago. See Barton v. Constellium Rolled Prods.-Ravenswood, LLC, 851 F.3d 349, 354 (4th Cir. 2017); see also Finley Hosp. v. NLRB, 827 F.3d 720, 725 (8th Cir. 2016); Michels Corp. v. Cent. States, Se., & Sw. Areas Pension Fund, 800 F.3d 411, 421 (7th Cir. 2015).
There is one area, it’s worth pointing out, in which our circuit has followed these traditional rules. Pre-Tackett and post-Tackett, we have honored these principles if the healthcare-benefits promise was contained in an employment agreement between an individual and the company, as opposed to a collectively bargained agreement. See Sprague v. Gen. Motors Corp., 133 F.3d 388, 400 (6th Cir. 1998) (en banc). That means we have applied a presumption in favor of lifetime vesting where it is needed least (company promises in which the employees were collectively represented by a union), not where it is needed most (company promises in which the employees *890 have no representative). Notably, Tackett favorably cited Judge Nelson’s decision in Sprague, suggesting we should apply the same rules in both settings. Tackett, 135 S.Ct. at 936-37.
I am hard pressed to understand our hesitance in following the path that the Supreme Court has set for us, that the other circuits have long followed, and that we have followed when it comes to non-collectively bargained agreements with respect to the same subject matter. In what area of contract law would we disregard a durational clause? I know of none. How, then, can this be the application of ordinary contract principles? I know not.
In abrading an inter-circuit split (and an intra-circuit split) that the Supreme Court just sutured shut, the court with respect makes too much of the silence in the healthcare-benefits provision about the length of the commitment and too little of the durational clause’s express limitation of these benefits to “May 2, 2004.” Contractual ambiguity, it may be true, gives courts a warrant to search the record for extrinsic evidence of contractual meaning. But that warrant requires a textual finding unfound here — that there are two competing interpretations, both of which are fairly plausible readings of the language. See TMW Enters., Inc. v. Fed. Ins. Co., 619 F.3d 574, 582-83 (6th Cir. 2010); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 425 (2012). Put differently, if there is only one fair reading of the agreement, that is the end of the matter.
So it should end here. Everyone agrees on one fair reading: that retiree healthcare benefits would last, like the rest of the promises in the agreement, until the contract expired on May 2, 2004. The majority offers another: that the contract promised retiree benefits for life. But the contract principles that the Court spelled out in Tackett do not permit that reading.
Consider the court’s efforts to identify ambiguity and to resolve it in favor of a lifetime promise. It points to a provision in the Group Benefit Plan that says pension-eligible retirees “who retire ... after 7/1/94” and their spouses “shall be eligible for the Group benefits as described in the following paragraphs [which include medical coverage]. All other coverages cease coincident with the date of employment termination due to retirement.” R. 439-3 at 28. But this provision says only that healthcare coverage continues past the date of retirement. It does not say that benefits continue past the termination date of the agreement, much less that they continue for life.
Silence about the length of this commitment, the court adds, supports a finding of ambiguity. In the court’s words: “when read in conjunction with the whole instrument, ... this silence, rather than resolving ambiguity, furthers it.” Maj. Op. 882. But that is true only if we ignore what “the whole instrument” says. When read in conjunction with a durational clause that expressly limits all provisions of the agreement to six years, silence as to a benefits provision must submit to the durational clause, not override it.
Nor does this interpretation require us to “presume that [the] general durational clause says everything about the intent to vest.” Tackett v. M & G Polymers USA, LLC, 811 F.3d 204, 209 (6th Cir. 2016); see Maj. Op. 882. That is a straw man. The durational clause sets an end date, hardly a surprise in a collective bargaining agreement, and that end date applies when nothing in the agreement contradicts it. No presumptions necessary. And no ambiguity. Silence on the duration of the retiree healthcare benefits means that the agreement’s general durational clause is still the only provision specifying when those commitments terminate — May 2, *891 2004. See Gallo, 813 F.3d at 269-70. Any other approach is Yard-Man re-born, rebuilt, and re-purposed for new adventures.
The court is troubled that “[gjiving dis-positive weight to the general-durational clause here would move the thumb from the employees’ side of the scale and place it on the side of employers” and that “Tackett sought to create a level playing field, not to foster an equally inequitable one.” Maj. Op. 883. No worries there. As just shown, there is no risk in giving “dis-positive weight” to an express general du-rational clause so long as courts honor express limits or extensions of promises in the agreement. More fundamentally, Tack-ett did not direct courts to give employees and employers an equal shot in litigation regardless of what their contract said; it ensured that collective bargaining agreements would be interpreted by the same, ordinary principles as other contracts. Equality between contracts, not between litigants faced with different contractual commitments. In any other area, we would say an uncontradicted general durational clause controls all of the promises in an agreement. If that puts a thumb on any side of the scale, it’s because the text of the collectively bargained agreement put it there. And silence cannot lift it.
How, one might ask, does the court sidestep the Supreme Court’s command that, “when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life”? Tackett, 135 S.Ct. at 937. Isn’t that rule applicable here? Don’t the court’s repeated references to “silence” about the duration of the healthcare-benefits commitment implicate the rule? The majority demurs “because the parties in this case carved out certain benefits, such as life insurance and healthcare insurance, and stated that those coverages ceased at a time different than other provisions of the CBA.” Maj. Op. 882. But that is a recycling of the point addressed above— that the agreement says that retiree healthcare benefits continue after the date of retirement, quite understandably, but not after the expiration date of the agreement. All the court has to go on to extend the benefits past the end of the agreement, once again, is: silence. And under Tackett, we cannot infer vesting from silence.
The court next claims ambiguity about whether the healthcare benefits last a lifetime because eligibility for healthcare benefits is linked to pensions and because pensions are vested lifetime commitments. But the tying language in this contract has nothing to do with the duration of the healthcare benefits. The agreement says that pensioners “shall be eligible” for healthcare benefits for as long as the agreement provides those benefits — that is, until May 2, 2004 — not for as long as retirees earn a pension. The court admits that the tying of healthcare benefits to pensioner status “by itself, says little about whether those healthcare benefits should vest for life. It does, however, create an ambiguity about the parties’ intentions.” Maj. Op. 882.
But if tying says little about vesting, how does it create ambiguity about vesting? I do not know. Tackett at any rate “rejected this kind of ‘tying’ analysis as a relic of a misdirected frame of reference, calling it one of many Yard-Man inferences that was ‘inconsistent with ordinary principles of contract law.’ ” Gallo, 813 F.3d at 272 (quoting Tackett, 135 S.Ct. at 937). A forbidden inference cannot generate a plausible reading. And without a plausible explanation for treating the healthcare benefits promise as a promise for life, the general durational clause controls. We do not “expect to find lifetime commitments in time-limited agreements.” Gallo, 813 F.3d at 269. To suppose that *892 this agreement’s tying language suggests lifetime vesting clearly enough to override an explicit durational clause is to find an elephant-sized commitment in a linguistic mousehole. See id.; Whitman v. Am. Trucking Ass’ns, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). It doesn’t fit, and it doesn’t belong.
Because the retiree healthcare benefits expired on May 2, 2004, the extrinsic evidence invoked by the court is neither here nor there. Still, even setting aside the absence of a contractual ambiguity to resolve — even indeed setting aside the agreement’s provision precluding use of parol evidence, R. 439-4 at 47 — the extrinsic evidence does not support the court’s position. Start with the parties’ bargaining history. “The 1998 CBA not only set the rules for employees who retired during the next six years of that CBA; it also reset the rules for employees who retired after July 1, 1994, which is inconsistent with the notion that the 1990 and 1995 CBAs (using the same [retiree healthcare benefit] language as the 1998 CBA) created unalterable, irreducible health benefits.” Reese v. CNH Am. LLC, 574 F.3d 315, 324 (6th Cir. 2009). After Tackett, that same logic shows a lack of vesting, which is exactly what we concluded in Gallo. That these benefits were reset (or “continued” as in Gallo) after prior agreements expired undermines a theory of vesting because it indicates that they would have to be reset again when this agreement expired. See Gallo, 813 F.Sd at 270.
This bargaining history also casts a clarifying light on the accounting document that shows CNH planned to pay healthcare benefits for the life of the retiree. CNH and the union renewed retiree healthcare benefits in each successive agreement until this litigation began. All that the accounting document shows is that CNH expected that practice to continue and forecast its budget accordingly. We dealt with exactly this situation in Gallo: “That a company to its credit hopes to subsidize healthcare benefits for its retirees for as long as possible does not mean it has promised to do so.” 813 F.3d at 274. Taken in context, the accounting document shows only that CNH hoped and planned to pay lifetime healthcare benefits, not that it was contractually bound to do so. See Witmer v. Acument Glob. Techs., Inc., 694 F.3d 774, 777 (6th Cir. 2012).
Nor is the remaining extrinsic evidence helpful, as most of it predates the relevant time period. The plaintiffs consist of retirees from between July 1, 1994 and April 1, 2005, and this dispute concerns what the company promised to that group. No amount of parol evidence regarding prior agreements, including promises made to workers who retired in the 1970s and ’80s, is probative of the meaning of a set of distinct promises made by a new corporate parent for the first time in 1995, and then in altered form in 1998. The 1993 and 1995 “cap letters” showed that CNH planned to provide coverage beyond the term of the 1995 agreement, but again a commendable and hope-filled plan does not entail a binding commitment. We should reject this argument for the same reason the Fourth Circuit just rejected it: “The Cap Letters both fall far short of Tackett’s, requirement for a clear signal that parties intend for benefits to vest and fail to negate the unambiguous durational language in [the agreement].” Barton, 851 F.3d at 356. The “Letter[s] of Understanding” that accompanied the 1998 agreement, moreover, reinforce the conclusion that the benefits were not vested. One letter provided that CNH could unilaterally alter benefits to reflect new healthcare laws, and the other limited its promise to keep retiree costs constant to “the term of the 1998 labor agreement,” R. 439-3 at 42. Even if admissible, the documents do not establish a lifetime right to healthcare benefits.
*893 * * *
The conundrum of today’s decision is that Tackett tells us to apply ordinary contract principles to these agreements, and yet every other court in the country would handle this case differently. I could double the length of this opinion with applicable quotes from other circuits but will offer just a few to make the point. Here’s one circuit: “[Ejntitlements established by collective bargaining agreements do not survive their expiration or modification .... The mere silence of Collective Bargaining Agreements and plan documents concerning the vestment of welfare benefits fails to give rise to an ambiguity.” Senn v. United Dominion Indus., Inc., 951 F.2d 806, 816 (7th Cir. 1992) (quotation omitted). And another: “Contractual vesting is a narrow doctrine. To prevail, Plaintiffs must assert strong prohibitory or granting language; mere silence is not of itself abrogation [of the right to alter health coverage].” Wise v. El Paso Nat. Gas Co., 986 F.2d 929, 938 (5th Cir. 1993). And another: “Promising to provide benefits for a certain period of time necessarily establishes that once that time period expires, the promise does as well.... Therefore, we conclude that this provision unambiguously establishes that once the CBAs expired, Multifoods was free to reduce retiree medical benefits.” Am. Fed’n of Grain Millers v. Int’l Multifoods Corp., 116 F.3d 976, 981 (2d Cir. 1997). And another: “The most natural reading of a contract that has defined endpoints of 1998 and 2001 is that terms in the contract apply to events between 1998 and 2001.” Des Moines Mailers Union, Teamsters Local No. 358 v. NLRB, 381 F.3d 767, 770 (8th Cir. 2004). And still another: “Silence on duration ... may not be interpreted as an agreement by the company to vest retiree benefits in perpetuity.” UAW v. Skinner Engine Co., 188 F.3d 130, 147 (3d Cir. 1999). And yet another: “The plain language of the CBA and SPD clearly indicates that the retiree health benefits did not vest [because the general durational clause] contains explicit durational language stating that the retiree health benefits continue ‘for the term of the governing CBA.” Barton, 851 F.3d at 354.
Either our circuit or the rest of the country is not applying “ordinary principles of contract law” to these agreements. Tackett, 135 S.Ct. at 937. I fear that we, again, are out of step.
A last point, about the equities. No one likes the thought of ending healthcare benefits for retirees who .have worked for much of their lives and who may not be able to take on new jobs now. But it is by no means clear that this is what would happen if we followed Tackett and ruled that the benefits did not vest. The absence of a contractual right to lifetime healthcare does not mean that these retirees will not receive healthcare benefits. Even aside from existing federal healthcare programs, there’s no reason to think that the incentives that drove the company and the union to agree repeatedly on retiree healthcare benefits in the past will cease to drive the parties to make similar arrangements in the future. During oral argument, CNH confirmed that it intended, if it prevailed on the vesting issue, to bring this class of retirees into a healthcare plan that mirrors the one offered to current employees and more recent retirees. At stake, then, is the plaintiffs’ desire for better healthcare benefits than current employees and recent retirees. Whether that request is fair or not, equitable or not, it isn’t what this collective bargaining agreement provides.
For these reasons, I respectfully dissent.