**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 18a0418n.06**

**No. 17-3885**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Aug 16, 2018
DEBORAH S. HUNT, Clerk

IUE-CWA, et al.,

      Plaintiff-Appellant,

v.

GENERAL ELECTRIC CO.,

      Defendant-Appellee.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO

---

**BEFORE:** **CLAY, STRANCH, and LARSEN, Circuit Judges.**

CLAY, J., delivered the opinion of the court in which STRANCH, J., joined. STRANCH, J. (pp. 28–31), delivered a separate concurring opinion. LARSEN, J. (pg. 32), delivered a separate opinion concurring in Parts 2 and 3 of the majority opinion and in the judgment.

**CLAY, Circuit Judge.** Plaintiffs filed suit against Defendant General Electric Company ("GE") under Section 301 of the Labor Management Relation Act, 29 U.S.C. § 185; Section 502 of the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B), (a)(2), and (a)(3); and the Declaratory Judgment Act, 28 U.S.C. § 2201(a) to enforce their rights to retirement healthcare benefits under a collective-bargaining agreement ("CBA"). The district court granted Defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), holding that the CBA did not vest lifetime retirement healthcare benefits. Because the controlling case law compels the conclusion that the CBA does not vest healthcare benefits for life, we **AFFIRM**.

## BACKGROUND

### Factual Background

Plaintiffs are a group of unions[1] who represent GE employees and twenty-six individual retirees who were represented by those unions when they worked for GE. Since 1973, GE and the unions have negotiated a new CBA every three to four years. Each negotiation results in the execution of a Memorandum of Settlement ("MOS") between GE and the unions that establishes the terms of the new CBA. In connection with each CBA from 1973 to 2011, GE and the unions bargained the terms of Retiree Benefit Plans, which were incorporated into each CBA through the applicable Pension & Insurance Agreement ("PIA"). The PIAs formed Part Two of each MOS, and they constituted "the exclusive and definitive Agreement between the parties with respect to Pensions and Insurance." (R. 46-3, PIA, PageID # 648.) Each PIA attached black-lined versions of the Retiree Benefit Plans reflecting the changes described in the MOS.

For many years, GE provided eligible retirees over 65 years of age with supplemental healthcare coverage over and above that provided by Medicare. This case concerns four of GE's Retiree Benefit Plans in effect prior to 2016: the GE Pensioners Prescription Drug Plan ("Drug Plan"), the GE Medical Care Plan for Pensioners ("Medical Plan"), the GE Medicare Insurance Plan for Part B Benefits ("Medicare B Plan"), and the GE Pensioners Hospital Indemnity Plan ("Hospital Plan"). The Drug Plan and Medical Plan were set forth as Parts VIII and VII of the GE Life, Disability, and Medical Plan ("LDM Plan"). The other two Plans, the Hospital Plan and the Medicare B Plan, were identified as separate plans in the PIAs. The Retiree Benefit Plans covered

---

[1] Nine unions formed the Coordinated Bargaining Committee of GE Unions ("CBC") to negotiate with GE: IUE-CWA; IUE-CWA GE and Aerospace Conference Board; United Electrical, Radio & Machine Workers of America; International Brotherhood of Electrical Workers; International Association of Machinists and Aerospace Workers; International Union, United Automobile Aerospace and Agricultural Implement Workers of America; International Federation of Professional and Technical Engineers; International Brotherhood of Teamsters; and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union.

prescription drugs as well as certain costs not covered by Medicare for eligible medical care and hospital visits. GE offered the Retiree Benefit Plans to all eligible retirees, including those who had retired before the effective date of the PIA. In each PIA, GE agreed to make the Retiree Benefit Plans available, and the unions "on their own behalf and on behalf of the employees" accepted them and "the terms and conditions thereof." (R. 46-3, PIA, PageID # 636.)

The Hospital and Medicare B Plans and the LDM Plan each contained a nearly identical reservation-of-rights clause, providing:

> This Plan may be amended, suspended, or terminated by the [GE] Board of Directors, in whole or in part, at any time without limitation, except as may be otherwise provided in collective bargaining agreements and except further that no such amendment, suspension, or termination shall adversely affect to a material degree any short term disability benefit payable with respect to any sickness, injury, or Covered Medical Expenses incurred prior to the effective date of such amendment, suspension, or termination, or affect the amount of GE Life Insurance Benefits and/or Trust Death Benefits for those employees who have retired, as described in **Part I, Section D**.

(R. 46-4, LDM Plan, PageID # 840 (emphasis in original); *see* R. 46-6, Hospital Plan, PageID # 872 (similar); R. 46-5, Medicare B Plan, PageID # 861–62 (similar).)

Each PIA contained two other provisions of significance to this case—one governing Defendant's right to change the Benefit Plans and the other governing the duration of the parties' obligations. First, each PIA contained a specific durational clause, which provided that none of the Benefit Plans, "to the extent applicable to employees, shall be amended or terminated by [GE] so long as [the PIA] remain[ed] in effect." (R. 46-3, PIA, PageID # 638.) By its terms, this provision limits the promises to "employees"—which Plaintiffs acknowledge does not include pre-existing retirees—and restricts the time-limit of the promises to while "this Agreement remains in effect." (*Id.*) Second each PIA also contained a general durational clause, which provided that the PIA would "continue in full force and effect" for an initial fixed term of three or four years, "and

from year to year thereafter," but also authorized either side to notify the other during a specified period of "its intention to terminate th[e] Agreement" upon a certain date. (*Id.* at PageID # 648.) The initial fixed term for the 2011 PIA ended on June 21, 2015.

On September 5, 2014, during the term of the 2011 CBA, the GE Board of Directors adopted a resolution effective January 1, 2015 stating that "all retiree healthcare benefits provided under the [LDM Plan and other Plans] are hereby transferred to separate ERISA benefit plans for retirees which are hereby established." (R. 1-10, Extracts from Minutes of Meeting of the GE Board, PageID # 215.) Plaintiff unions were not informed of the new plan structure until after the conclusion of the 2015 negotiations with GE and never consented to the change in the Benefit Plans.

In June 2015, the 2011 CBA expired, and GE and the unions entered into negotiations for a new CBA. According to Plaintiffs, as part of the negotiations, the unions agreed to changes in retiree medical benefits for those retirees who retired *after* the new agreement took effect on June 22, 2015. The new CBA took effect on June 22, 2015. And on January 1, 2016, GE replaced the existing Retiree Benefit Plans with an annual $1,000 Retiree Reimbursement Account. As part of this program, GE also provides access to counselors to assist eligible retirees in selecting and purchasing health insurance through a private exchange. This new program applies to *all* retirees, even those who retired under earlier CBAs. Plaintiffs allege that, under the new plan, retirees who are over the age of 65 will pay up to $4,850 annually in co-pays for critical prescription medicine.

**Procedural History**

On November 9, 2015, Plaintiffs filed suit under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185; Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), (a)(2), and (a)(3); and the Declaratory

Judgment Act, 28 U.S.C. § 2201(a), alleging breaches of the CBA and violations of ERISA, and seeking damages, declaratory judgment, and an injunction preventing GE from altering the medical benefits provided under the CBA. They argued that GE breached the agreements by altering the terms of retiree benefits that had already vested.

As evidence that the parties intended for unalterable medical benefits to vest for the life of union retirees, Plaintiffs pointed to language in the CBAs stating that the Drug Plan and Medical Plan "shall be made available" and also stating that GE "agrees . . . it will make available [the Hospital Plan and the Medicare B Plan] to pensioners when they attain age 65 and after they have retired." (R. 46-3, PIA, PageID # 635–36.) Plaintiffs also identified several features of each MOS that allegedly demonstrated that the unions and GE both understood that the Retiree Benefit Plans provided lifetime benefits that would continue throughout a GE worker's retirement in the same way that his or her pension did:

1. Each MOS referred to "Lifetime Maximum Benefits" available to pensioners under the Retiree Benefit Plans;

2. Before 2007, the MOS and PIAs capped the amount of GE's post-contract financial responsibility for its Retiree Benefit Plans after the CBAs expired;

3. The Retiree Benefit Plans incorporated the GE pension plan provisions, reflecting the "mutual understanding that GE retirees were entitled to both their GE pension and their GE retiree health benefits throughout their lifetimes";

4. "The terms of the 2011 MOS between [the unions] and GE show that the terms of the Prescription Drug Plans for existing retirees were left intact for pre-2004 retirees and changed only for post-2004 retirees with the permission of the [unions]";

5. "Title I Section 7 of the 2011 Pension & Insurance Agreement provides that GE agrees that during the term of this agreement . . . 'neither [the LDM Plan] nor . . . the GE Pensioner's Hospital Indemnity Plan, the GE Medicare Insurance Plan for Part B Benefits, all to the extent applicable to employees, shall be amended or terminated by the Company so long as this agreement remains in effect'" ;

6. Other provisions constituted express written promises, which GE and union representatives allegedly understood as creating a promise of lifetime retiree healthcare

benefits, including: the opportunity to reenroll for coverage under the Prescription Drug Plan "at any time regardless of your health status"; and a surviving-spouse provision, which stated that in the event of the retiree's death, the surviving spouse or eligible domestic partner would "have medical care benefits available equal to the remaining balance, if any, of the amount of such benefits available to [the retiree] and [his or her] spouse prior to [the retiree's] death."

(R. 1, Compl., PageID # 8–13.)

Defendant moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6). And on July 28, 2017, the district court granted the motion. The court held that the Retiree Benefit Plans were "subject to express reservation of rights provisions authorizing GE to amend or terminate the Plan 'at any time without limitation' except as provided in the CBAs," (R. 62, Order, PageID # 1616), and that "the explicit terms of the CBAs restricted GE's right to amend or terminate the [Retiree] Benefit Plan only 'so long as [the CBA] remain[ed] in effect.'" (*Id.* (quoting R. 46-3, PIA, PageID # 638).) Thus, "[o]nce the CBAs promising the contested benefits ended, so too did any restriction on GE's right to amend or terminate the Plans." (*Id.*) And "[t]ogether, these reservation of rights clauses evidence a clear intent not to vest benefits and merely to restrict GE's right to amend only during the duration of the CBAs." (*Id.* at PageID # 1618.)

The district court also found that "[t]he CBAs promised that the Benefit Plans would be 'made available' to employees who retired during the CBA's term, but contain no durational provision extending that promise beyond the termination of the CBAs." (*Id.* (citing R. 46-3, PIA, PageID # 632; *Gallo v. Moen Inc.*, 813 F.3d 265, 269 (6th Cir. 2016)).) Thus, following *Gallo*, 813 F.3d at 271–72, and *Cole v. Meritor, Inc.*, 855 F.3d 695 (6th Cir. 2017), the court held that in the absence of specific language extending the promises, the CBAs' general durational clause controlled to bar Plaintiffs' argument that the benefits vested for life.

The court summarily rejected Plaintiffs' remaining arguments for vesting, holding that: Plaintiffs' tying argument failed under *Gallo*, 813 F.3d at 272; the "Cap Clause" language "did not

address GE's 'post-contract' responsibilities," but only the "limits to [GE]'s financial obligations during the contract" (R. 62, Order, PageID # 1624); and none of Plaintiffs' references to "miscellaneous provisions" that allegedly evinced vesting (including the "surviving spouse," "lifetime maximum," and "enroll at any time" provisions) were "sufficient to overcome the clear reservation of rights and durational provisions of the CBAs and Benefit Plans to create vesting." (*Id.* at PageID # 1625–26.) Further, other features of the agreements supported an inference that the benefits were *not* vested: namely, the parties explicitly provided for certain retiree life insurance benefits to vest, but not the medical benefits; and the extrinsic evidence included in Plaintiffs' complaint revealed that retiree health benefits had changed over time, which was inconsistent with an intention to vest because "a union[] could not legally consent to a reduction in preexisting retirees' benefits if those benefits were actually vested." (*Id.* at PageID # 1622.)

Plaintiffs filed a timely Notice of Appeal.

## DISCUSSION

### Standard of Review

"We review the district court's grant of a Rule 12(b)(6) motion to dismiss without deference, interpreting the complaint in the way most favorable to the retirees." *Watkins v. Honeywell Int'l, Inc.*, 875 F.3d 321, 323 (6th Cir. 2017) (citing *Saab Auto. AB v. Gen. Motors Co.*, 770 F.3d 436, 440 (6th Cir. 2014)). In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must take all well-pleaded allegations in the complaint as true and construe those allegations in the light most favorable to the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). We "interpret contracts according to their plain meaning, in an ordinary and popular sense." *Rogers v. Internal Revenue Serv.*, 822 F.3d 854, 860 (6th Cir. 2016) (quoting *Gillham v. Ten. Valley Auth.*, 488 F. App'x 80, 84 (6th Cir. 2012)). "That means we do not look at extrinsic

evidence unless the contract is ambiguous." *Watkins*, 875 F.3d at 323; *see Tackett v. M & G Polymers USA, LLC*, 811 F.3d 204, 208–09 (6th Cir. 2016) (*Tackett III*).

**Analysis**

Plaintiffs filed suit under LMRA § 301 and ERISA § 502. "Section 301 of the LMRA provides a federal right of action for 'violation[s] of contracts between an employer and a labor organization representing employees.'" *Moore v. Menasha Corp.*, 690 F.3d 444, 450 (6th Cir. 2012) (alteration in original) (quoting 29 U.S.C. § 185(a)). It also creates "a derivative ERISA claim, because the disputed healthcare benefits were agreed upon pursuant to a union-negotiated contract." *Id.* (citing *Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 363 (6th Cir. 2009)). Plaintiffs argue that the CBA provided employees who retired under or prior to the 2011 CBA with vested lifetime healthcare benefits, meaning those who retired before the 2011 CBA expired were entitled to healthcare even after the 2011 CBA expired. The sole inquiry on appeal in this case is whether the Retiree Health Plans vested healthcare benefits for life.

## 1. Legal Background

"CBA[s] typically create both pension and welfare-benefit plans." *Cole*, 855 F.3d at 698 (citing *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015) (*Tackett II*)). "Although ERISA imposes 'elaborate minimum funding and vesting standards for pension plans,'" *id.* (quoting *Tackett II*, 135 S. Ct. at 933), "[e]mployers have large leeway to design disability and other welfare plans as they see fit," *Tackett II*, 135 S. Ct. at 933 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S 822, 833 (2003)), and they "are generally free . . . , for any reason at any time, to adopt, modify, or terminate welfare plans" that provide retiree health benefits. *Id.* Thus, although employers may choose "to vest retirees with lifetime benefits," *id.*, upon retirement, they are not required to do so. "To vest benefits is to render them forever unalterable. Because vesting

of welfare plan benefits is not required by law, an employer's commitment to vest such benefits is not to be inferred lightly[.]" *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998) (*en banc*). This creates a question for the Court: how are we to determine when the parties agreed that retiree healthcare benefits would continue beyond the expiration of the collective bargaining agreement? For years, this Circuit turned to its decision in *UAW v. Yard-Man, Inc.* for guidance. 716 F.2d 1476 (6th Cir. 1983).

In *Yard-Man,* the Court referencing application of "basic principles of contractual interpretation," found a CBA to provide for vested lifetime insurance benefits for retirees. *Id.* at 1479–80. We first concluded that the provision governing retiree insurance benefits—which stated only that the employer "will provide" such benefits—was ambiguous as to the duration of those benefits. *Id.* at 1480. To resolve that ambiguity, we looked to other provisions of the agreement. Although no provision specifically addressed the duration of retiree healthcare benefits, we identified multiple provisions lending textual support to an intention to vest. *Id.* at 1480–82.

We also found support for vesting in the contract's broader context. Specifically, we observed that "[b]enefits for retirees are . . . not mandatory subjects of collective bargaining" and so "employees are presumably aware that the union owes no obligation to bargain for continued benefits for retirees." *Id.* at 1482. Because of this, we concluded that it was "unlikely that such benefits . . . would be left to the contingencies of future negotiations." *Id.* We also reasoned that "retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained." *Id.* We explained that this was "not to say that retiree insurance benefits are necessarily interminable by their nature," but "[r]ather, as part of the context from which the collective bargaining agreement arose, the nature of such benefits simply provides another inference of intent." *Id.* We clearly stated that

"[s]tanding alone, this factor would be insufficient to find an intent to create interminable benefits," but, "[i]n the present case, . . . this contextual factor buttresses the already sufficient evidence of such intent in the language of this agreement itself." *Id.* Most significantly, we held that all of these "persuasive considerations" outweighed "contrary implications derived from a routine duration clause terminating the agreement generally." *Id.* at 1482–83. For more than thirty years, this was the rule in the Sixth Circuit.

Then came the Supreme Court's *Tackett II* decision, in which the Court instructed us to interpret collective bargaining agreements "according to ordinary principles of contract law," and retired the "*Yard-Man* inferences,"[2] holding that they "violate[d] ordinary contract principles by placing a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements." 135 S. Ct. at 933–35. In the Supreme Court's view, our "inferences" in favor of vesting healthcare benefits for life were "too speculative and too far removed from the context of any particular contract to be useful in discerning the parties' intention." *Id.* at 935. We were directed to no longer assume that "retiree health care benefits are not subjects of mandatory collective bargaining" because parties frequently "voluntarily agree to make retiree benefits a subject of mandatory collective bargaining." *Id.* at 936. We were not to interpret retiree benefits according to the "premise that [they] are a form of deferred compensation," and the Court specifically criticized our "refus[al] to apply general durational clauses to provisions governing retiree benefits" and our "fail[ure] even to consider the traditional principle that courts should not construe ambiguous writings to create lifetime promises." *Id.* (citation omitted). The Court admonished us to apply the ordinary principle that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement." *Id.* at 937 (quoting *Litton Fin.*

---

[2] Presumably without healthcare.

*Printing Div. v. NLRB*, 501 U.S. 190, 207 (1991)).  The Court explained, "That principle does not preclude the conclusion that the parties intended to vest lifetime benefits for retirees," "[b]ut when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life." *Id.*

On remand, we interpreted the Court's instructions, and identified the following, non-exhaustive list of the "ordinary principles" at issue in *Tackett II*:

- [A]s with any other contract, the parties' intentions control.

- Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.

- Although a court may look to known customs or usages in a particular industry to determine the meaning of a contract, the parties must prove those customs or usages using affirmative evidentiary support in a given case.

- [T]he written agreement is presumed to encompass the whole agreement of the parties.

- Courts [should] avoid constructions of contracts that would render promises illusory because such promises cannot serve as consideration for a contract . . . . [A] promise that is "partly" illusory is by definition not illusory.

- [C]ourts should not construe ambiguous writings to create lifetime promises. . . . [C]ontracts that are silent as to their duration will ordinarily be treated not as "operative in perpetuity" but as "operative for a reasonable time."

- [T]raditional rules of contractual interpretation require a clear manifestation of intent before conferring a benefit or obligation.

- Contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement.

- When a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life.

*Tackett III*, 811 F.3d at 208 (alterations in original) (quoting *Tackett II*, 135 S. Ct. at 933–37). We also identified additional "ordinary principles of contract law" referenced in Justice Ginsburg's concurrence. Those included:

- Under the cardinal principle of contract interpretation, the intention of the parties, to be gathered from the whole instrument, must prevail.

- [W]hen the contract is ambiguous, a court may consider extrinsic evidence to determine the intentions of the parties . . . . [F]or example, the parties' bargaining history.

- No rule requires "clear and express" language in order to show that parties intended health-care benefits to vest.

- Constraints upon the employer after the expiration date of a collective-bargaining agreement . . . may be derived from the agreement's "explicit terms," but they may arise as well from implied terms of the expired agreement.

*Id.* at 208–09 (alterations in original) (quoting *Tackett II*, 135 S. Ct. at 937–38 (Ginsburg, J., concurring)). "Importantly," *Tackett III* noted, "the Court rejected *Yard-Man*'s inferences in favor of retirees, but also declined to adopt an 'explicit language' requirement in favor of companies." *Id.* at 209 (citing *Tackett II*, 135 S. Ct. at 937 (lead op.), 938 (Ginsburg, J., concurring); *Litton Fin. Printing Div.*, 501 U.S. at 203). *Tackett III* interpreted the Supreme Court's decision as "prevent[ing] us from presuming that 'absent specific durational language referring to retiree benefits themselves, a general durational clause *says nothing* about the vesting of retiree benefits,'" *id.* at 209 (emphasis in original), but it also held that we "cannot presume that the *absence* of such specific language, by itself, evidences an intent *not* to vest benefits or that a general durational clause says *everything* about the intent to vest," *id.* (emphasis in original). In light of this Court's subsequent case law, that claim has begun to ring hollow.

Our next occasion to address these issues was in *Gallo*, 813 F.3d 265. In *Gallo*, this Court read a contract that stated that "[c]ontinued hospitalization, surgical and medical coverage will be

provided without cost to past pensioners." *Id.* at 269. After canvassing the agreement, we concluded that the CBA did not unambiguously provide for vested retiree healthcare benefits because the general durational clause foreclosed the retirees' vesting argument. *Id.* We emphasized that "[w]hen a specific provision of the CBA does not include an end date, we refer to the general durational clause to determine that provision's termination." *Id.* In other words, "[a]bsent a longer time limit in the context of a specific provision, the general durational clause supplies a final phrase to every term in the CBA: 'until this agreement ends.'" *Id.* "Consistent with traditional contract interpretation principles and with prior precedents of the Supreme Court, 'contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement.'" *Id.* at 269–70 (quoting *Litton Fin. Printing Div.*, 501 U.S. at 207). The Court also pointed to a number of factors that it concluded evidenced an intention not to vest the benefits: the CBAs provided for "[c]ontinued" medical coverage to "past pensioners," and "[t]here would be no need to 'continue' such benefits if prior CBAs had created vested rights to such benefits"; other provisions contained vesting language, and "we must assume that the explicit guarantee of lifetime benefits in some provisions and not others means something"; and the CBA contained a reservation-of-rights clause, which the Court held was "incompatible" with an intention to vest for life. *Id.* at 270.

Then came a trifecta of cases, all published on the same day: *Cole v. Meritor*, 855 F.3d 695; *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. (UAW) v. Kelsey-Hayes Co.*, 854 F.3d 862 (6th Cir. 2017); and *Reese v. CNH Indus. N.V.*, 854 F.3d 877 (6th Cir. 2017). In *Cole*, this Court relied on *Gallo* to hold that retiree healthcare benefits did not vest for life because the general durational clause controlled. 855 F.3d at 701. In *Kelsey-Hayes* and *Reese*, however, we relied on *Tackett III*'s pronouncement that a general durational clause does not say

"*everything* about the intent to vest," *Tackett III*, 811 F.3d at 209 (emphasis in original), and held that certain features of the CBAs at issue in those cases made the duration of the benefits ambiguous, which warranted a turn to extrinsic evidence. For example, in *Kelsey-Hayes*, certain healthcare benefits were time-limited and others were not, so when the CBA used language suggesting that benefits "continued," we said it was unclear until when. 854 F.3d at 867. In *Reese*, we said that the CBA's general durational clause did not control because the CBA did not "clearly state[] that the general-durational clause was intended to govern healthcare benefits," 854 F.3d at 883, and the parties had "carved out certain benefits . . . and stated that those coverages ceased at a time different than other provisions of the CBA," *id.* at 882. We also found revealing that the contract tied healthcare benefits to pension eligibility, which added to the ambiguity about the parties' intentions. *Id.* at 882–83. In both cases, we found that the extrinsic evidence indicated that the parties intended for the healthcare benefits to vest for life. *Reese*, 854 F.3d at 879; *Kelsey-Hayes*, 854 F.3d at 869.

Next was *Serafino*. In *Serafino v. City of Hamtramck*, 707 F. App'x 345, 354 (6th Cir. 2017), this Court again held that a series of CBAs did not create a vested right to lifetime healthcare benefits because "[a]ll of the CBAs . . . contain unambiguous general-durational clauses that defeat plaintiffs' argument." *Id*. Thus, the company's promise to provide benefits to a retiree "until that retired employee attains the age of sixty-five" did not mean what it said; instead, it meant "until [the retiree] reach[es] age 65 . . . or until the expiration of this agreement[,] whichever is sooner." *Id.* at 354 (emphasis omitted). *Watkins* followed suit, holding that the language "for the duration of this Agreement" limited the company's promise to provide healthcare "for as long as the agreement lasts." *Watkins*, 875 F.3d at 325.

On February 20, 2018, the Supreme Court reversed our decision in *Reese*. *CNH Indus. N.V. v. Reese*, 138 S. Ct. 761 (2018) (*per curiam*) (*Reese II*). The Court explained that our decision had improperly relied on the defunct *Yard-Man* inferences in a variety of ways: by refusing to give effect to the general durational clause, by reading the CBA's silence on a retiree healthcare end date as evidence of an intent to vest benefits, and by tying retiree benefits to pensioner status. *Id.* at 764–66. The Court explained that *Tackett II* prohibits the use of *Yard-Man*-style inferences not only in deciding whether benefits have vested, but also in determining when the CBA is ambiguous as to vesting, such that extrinsic evidence can then be considered to determine whether benefits have vested. *Id.* at 766. "*Tackett* . . . rejected these inferences not because of the *consequences* that the Sixth Circuit attached to them . . . but because they are not a valid way to read a contract. They cannot be used to create a reasonable interpretation any more than they can be used to create a presumptive one." *Id.* (emphasis in original). The Court decreed that a general durational clause should be "applied to all benefits, unless the agreement specified otherwise." *Id.* Further, although four Justices of the Court had previously explained that "a provision stating that retirees 'will receive' health-care benefits if they are 'receiving a [] pension'" is relevant to the examination of whether the parties intended healthcare benefits to vest, *Tackett II*, 135 S. Ct. at 938 (Ginsburg, J., concurring), the Court in *Reese II* held that looking to such tying of benefits as an indication of vesting is inconsistent with ordinary principles of contract law. *Reese II*, 138 S. Ct. at 766.

Just six days later, the Court vacated our decision in *Kelsey-Hayes* and remanded "for further consideration in light of" its opinion in *Reese II*. *Kelsey-Hayes Co. v. Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am.*, 138 S. Ct. 1166, 1167 (2018). We later explained that "[t]he Supreme Court's reversal in *Reese* and remand in *Kelsey-Hayes* are powerful indications that general durational clauses should dictate when benefits expire, unless an

alternative end date is provided." *Cooper v. Honeywell Int'l, Inc.*, 884 F.3d 612, 618 (6th Cir. 2018).

In *Cooper*, we again held that a retiree healthcare benefit provision in the CBA did not clearly provide an alternative end date to the CBA's general durational clause; therefore, we concluded that plaintiffs had failed to show a likelihood of success on their vesting argument. *Id.* at 614. The Court rejected the plaintiffs' reliance on language stating that the company would pay for healthcare insurance "until age 65," holding that such language was insufficient to indicate vesting beyond the expiration of the CBA. *Id.* at 618–19. The Court also pointed to language saying that other benefits were explicitly vested as an indication that the benefits at issue were not. *Id.* at 620–21. Finally, the plan contained a reservation-of-rights clause giving the company the "right to terminate the Plan, or any portion of the plan, at any time and for any reason," which the Court held was "manifestly inconsistent with vesting." *Id.* at 621.

Most recently, in *Fletcher v. Honeywell Int'l, Inc.*, we took the case law one step further, holding that language providing that "[u]pon the death of a retiree, the Company *will continue* coverage for the spouse and dependent children *for their lifetime*," neither indicated nor even implied that the agreement provided healthcare to retirees until their deaths; instead, it meant that the agreement provided "lifetime healthcare for surviving spouses and dependents *but not* for the retirees themselves." 832 F.3d 217, 226 (6th Cir. 2018). That may have been consistent with our case law—including *Gallo*'s strict prohibition on relying on "will continue" language. *Gallo*, 813 F.3d at 270–71. Indeed, although the retirees surely would appreciate the benefits being available for their spouses and children, one would not expect those retirees' dependents to receive superior coverage under an agreement designed to provide benefits for the retirees themselves.

In sum, the law that has developed in our Circuit since the Supreme Court overturned *Yard-Man* seems to be consistent with what one legal commentator has recognized as "a growing line of cases that refuses to put much legal weight on oral and written promises, employer custom and practice and even arguments about reliance in light of the enormous (and sometimes unexpected burden) retiree healthcare costs present for employers." Maria O'Brien Hylton, *After Tackett: Incomplete Contracts for Post-Employment Healthcare*, 36 PACE L. REV. 317, 322–23 (2016).

### 2. The Text of the GE CBA Fails to Establish Vesting

This case presents yet another episode in our Circuit's grappling with the fallout of *Tackett II*. Against the backdrop of this complicated case law, this Court must decide whether the 2011 CBA between the UAW and GE manifests an intention that the healthcare benefits would be vested. The district court held that the contract did not vest healthcare benefits for retirees. Our case law compels us to the same conclusion.

#### a. The reservation-of-rights clause.

First, as noted above, the Retiree Benefit Plans each contained a reservation-of-rights clause that looked something like the following:

> This Plan may be amended, suspended, or terminated by the [GE] Board of Directors, in whole or in part, at any time without limitation, except as may be otherwise provided in collective bargaining agreements and except further that no such amendment, suspension, or termination shall adversely affect to a material degree any short term disability benefit payable with respect to any sickness, injury, or Covered Medical Expenses incurred prior to the effective date of such amendment, suspension, or termination, or affect the amount of GE Life Insurance Benefits and/or Trust Death Benefits for those employees who have retired, as described in **Part I, Section D**.

(R. 46-4, LDM Plan, PageID # 840; *see* R. 46-6, Hospital Plan, PageID # 872 (similar); R. 46-5, Medicare B Plan, PageID # 862 (similar); R. 1, Compl., PageID # 16, 18–19.) The reservation-of-rights clause expressly reserved GE's right to "amend[], suspend[], or terminate[]" the Plans

"in whole or in part, at any time without limitation," except as may be otherwise provided in [the CBAs." (*Id.*) This Court has recognized that reservation-of-rights clauses are "manifestly inconsistent with vesting; by definition, vested benefits may not be unilaterally terminated." *Cooper*, 884 F.3d at 621.

Turning to the CBAs, we find a caveat on GE's right to "amend[], suspend[], or terminate[]" the Plans:

> The Company agrees that during the term of this Agreement:
> * * *
> (b) . . . [N]otwithstanding any provisions to the contrary in the [LDM] Plan, neither that Plan nor . . . the [Hospital] Plan, [nor] the [Medicare B] Plan . . . , all to the extent applicable to employees, shall be amended or terminated by the Company so long as this Agreement remains in effect.

(R. 46-3, PIA, PageID # 638.) Thus, the PIA sets out one clear limitation on GE's ability to alter the Retiree Healthcare Benefits: namely, it cannot amend or terminate the Plans "during the term of the [CBA]," in a way that affects "employees," and only "so long as [the CBA] remains in effect." (*Id.*) Indeed, this shows that healthcare benefits for employees *were* vested for the duration of the CBA, but the CBA sets no limitation on GE's ability to amend or terminate the Plans *once the CBA expires* or as affects those *other than employees*. And Plaintiffs have conceded that each CBA's "reference to 'employees'" did not include "those already retired" prior to that CBA. (R. 1, Compl., PageID # 12–13.) Accordingly, the terms of the agreement would have allowed GE to change the Plans for pre-existing retirees even during the course of the CBA.

This Court has said that, under ordinary contract principles, a reservation-of-rights clause, subject only to "the caveat" that certain benefits cannot be changed "for the life of th[e] agreement," is "incompatible with construing the agreement to create vested and unalterable benefits." *Gallo*, 813 F.3d at 270. Instead, a reservation-of-rights clause means that any alleged lifetime promise in a benefit plan is actually "a qualified one: . . . benefits were for life provided

the company chose not to terminate the plans, pursuant to clauses that preserved the company's right to terminate the plan." *Sprague*, 133 F.3d at 401 (quotation marks and citation omitted).

Plaintiffs argue that the Retiree Benefit Plans apply to both union employees and GE hourly employees who are not covered by CBAs, and, therefore, the most natural reading of the provision is that GE is free to amend the Plans with respect to non-union represented employees, but not with regard to the union employees. But *Gallo* rejected a similar argument, discussed more *infra*, and held that although the reservation-of-rights clause's placement in a paragraph discussing *employee* benefits might imply that the clause did not apply to *retirees*, the clause "d[id] not limit itself to those benefits." *Gallo*, 813 F.3d at 270–71. Similarly here, the reservation-of-rights clause does not restrict its application to non-union retirees, but states only that GE may "amend[], suspend[], or terminate[]" the benefits *except* as provided in the CBA. And as explained above, once the CBA expires, the limitations on GE's ability to amend, suspend, or terminate cease. *See Cooper*, 884 F.3d at 621 ("Honeywell retains the right to terminate retiree healthcare benefits, but only after the expiration of the 2011 CBA."). The reservation-of-rights clause, therefore, strongly implies an intention *not* to vest.

### b. *The general durational clause.*

Second, not only do the CBAs reserve for GE the right to amend or terminate the healthcare benefits, everything about the benefits was contained in a time-limited agreement. The PIA contains a general durational clause, which provides as follows:

> This Agreement shall . . . continue in full force and effect as to the Company and the Union and Locals recognized . . . through the 21st day of June, 2015, and from year to year thereafter, unless not more than 90 and not less than 60 days prior to such date or any anniversary thereof, either the Company or the Union shall notify the other in writing of its intention to terminate this Agreement upon such date or anniversary date.

(R. 46-3, PIA, PageID # 648.)

Although this Court has previously said that we "cannot presume that . . . a general durational clause says *everything* about the intent to vest," *Tackett III*, 811 F.3d at 209, we have also recognized that "it certainly says a lot," *Serafino*, 707 F. App'x at 352. And we have also said that "we should not expect to find lifetime commitments in time-limited agreements." *Gallo*, 813 F.3d at 269. Thus, "[a]bsent some strong indication within the four corners of the agreement itself—perhaps, a specific-durational clause that applied to certain provisions but not others—the contractual rights and obligations under a CBA terminate along with the CBA." *Serafino*, 707 F. App'x at 352 (citing *Tackett II*, 135 S. Ct. at 937).

In *Gallo*, we noted that a "general durational clause supplied a concrete date of expiration after which either party could terminate the agreement," 813 F.3d at 269, and we held that "[w]hen a specific provision of the CBA does not include an end date, we refer to the general durational clause to determine that provision's termination," *id.* (citing *Litton Fin. Printing Div.*, 501 U.S. at 207)). The same is true in this case. Indeed, as in *Gallo*, the general durational clause gives meaning to the phrases that Plaintiffs identify, namely, "will make available," "shall be made available," "will pay," and the like: "[t]hese terms *guarantee* benefits until the agreement expires, nothing more." *See id.* (citing *UAW v. Skinner Engine Co.*, 188 F.3d 130, 141 (3d Cir. 1999); *Senn v. United Dominion Indus., Inc.*, 951 F.2d 806, 816 (7th Cir. 1992)) (emphasis in original); *see also Cole*, 855 F.3d at 700 ("[T]hese durational clauses give meaning to the promise that healthcare benefits 'shall be continued.'"). What we said in *Cole*, we could say in this case: the general durational clause shows that the employer at most "guaranteed healthcare benefits only until the expiration of the final CBA, nothing more." 855 F.3d at 700; *see Serafino*, 707 F. App'x at 353.

As mentioned above, Plaintiffs argue that the CBA's general duration clause applies only to employees in the bargaining unit and not to retirees. "[T]his general duration provision follows

the definition of employees . . . providing that unless otherwise clearly indicated, the bargaining unit consists of GE 'employees so long as they are within a bargaining unit.'" (Brief for Appellant at 8 (emphasis omitted) (citing R. 46-3, PIA, PageID# 630–31).) Thus, they claim that this provision "cannot be read to terminate benefits for persons, including pensioners, who are not in the bargaining units included in the CBAs." (*Id.*) But *Gallo* rejected precisely this argument. 813 F.3d at 270–71. The Court explained: "although the reservation-of-rights clause comes in a paragraph discussing employee benefits, it does not limit itself to those benefits. It instead refers to [the company's] right to cancel the insurance '*policies*,' which—as other sections of the CBAs demonstrate—covered employees *and* retirees." *Id.* (emphasis in original). Because the same could be said in this case, the general duration provision applies to both employees and retirees under the 2011 CBA, and the general duration provision, absent some specific provision to the contrary, sets forth the duration of GE's obligation to provide retiree healthcare benefits.

### c. *The vesting of other provisions.*

Third, the Plans explicitly vest other benefits beyond the duration of the CBA. Specifically, the LDM Plan prohibits GE from exercising its reservation of rights to "adversely affect" certain specifically enumerated benefits, including short-term disability benefits, retiree life insurance, and death benefits of individuals who had already retired. (R. 46-4, LDM Plan, PageID # 840.) "That the CBA explicitly describes one type of benefit as 'vested' but does not do the same for retiree healthcare benefits is telling." *Cooper*, 884 F.3d at 620–21 (citing Gallo, 813 F.3d at 270). This Court held in *Gallo*, "the explicit guarantee of lifetime benefits in some provisions and not others" is a "difference in language [that] demands a difference in meaning." 813 F.3d at 270. And "[b]ecause a contract 'should be read to give effect to all its provisions and to render them consistent with each other,' *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63

(1995), we must assume that the explicit guarantee of lifetime benefits in some provisions and not others means something." *Id.* Thus, the express vesting of these other benefits—benefits included in the same Retiree Benefit Plans—indicates that GE and the unions knew how to vest benefits beyond the expiration of the CBA, and did not do so for the Plans at issue in this case.

### 3. Plaintiffs' Counterarguments Fail to Establish Vesting

As for Plaintiffs' several counterarguments, we have rejected them all before. Plaintiffs first point out that the Plans state that benefits "*shall* be made available," (R. 46-3, PIA, PageID # 632 (emphasis added)), that "insured employees *will pay* the monthly contributions set forth in [the LDM Plan]," (*id.* at PageID # 642 (emphasis added)), and that "[t]he Company *will pay* the balance of the net cost of such Plans," (*id.* (emphasis added)). This future language, they argue, supports their vesting claims. But "[i]f *Tackett* tells us anything . . . it is that the use of the future tense without more—without words committing to retain the benefit for life—does not guarantee lifetime benefits." *Gallo*, 813 F.3d at 271 (citing *Tackett II*, 135 S. Ct. at 937). As in *Gallo*, "[t]he relevant provisions offer healthcare coverage until *some point* in the future, but they do not say what that point is." *Id.* (emphasis in original).

Plaintiffs further point to language providing that GE "agrees that it *will make available* to pensioners *when they attain age 65 and after they have retired* the June 2011 [Hospital Plan]," (R. 46-3, PIA, PageID # 635 (emphasis added)), and that GE "*will* make available [the Medicare B Plan] to pensioners when they attain age 65 and after they have retired," (*id.* at PageID # 636). But *Serafino* rejected the argument that phrases like "until that retired employee attains the age of sixty-five (65)" indicate an intention to vest benefits or create any ambiguity at all. 707 F. App'x at 347. There, the Court found that such language did not evince an intention to vest because unless there is "a longer time limit in the context of a specific provision, the general durational

clause supplies a final phrase to every term in the CBA: 'until this agreement ends.'" *Id.* at 354 (quoting *Gallo*, 813 F.3d at 269). And *Cooper*, a recently published decision from this Circuit, went even further, holding that the "until age 65" language does not even vest benefits "until age 65." *Cooper*, 884 F.3d at 619. Indeed, there, the Court held, "a promise to continue providing benefits in a CBA . . . does not by itself vest those benefits in retirees beyond the CBA's expiration. All it does is (1) provide a guarantee of those benefits while the CBA is in effect and (2) provide for the expiration of those benefits even before the CBA itself expires." *Id.*

Following these cases, the future language in the GE CBA says merely that GE will provide benefits to retirees; it does not say for how long. That term is supplied by the specific provision that limits GE's ability to amend or terminate the benefits for the duration of the CBA and by the general duration clause.

Plaintiffs also claim that the absence of a specific durational limit in the Retiree Benefit Plans supports their contention that the benefits were meant to continue for life. Assuming, *arguendo*, that the limitation on GE's reservation-of-rights clause does not constitute a specific durational clause, this Court has rejected the argument that the absence of a specific durational clause implies an intention to vest for life. Indeed, we have said that "specific and general terms usually work in tandem" and a "CBA['s] general durational clause[] provide[s] a baseline or default rule, a point at which the agreements expire *absent more specific limits* relevant to a particular term." *Gallo*, 813 F.3d at 271–72 (emphasis in original); *see Cole*, 855 F.3d at 700–01. Therefore, the absence of specific durational language in the Retiree Benefit Plans does not mean that the benefits vest for life; instead, it means that "the general durational clause controls." *Gallo*, 813 F.3d at 272; *see Reese II*, 138 S. Ct. at 766 (explaining that "when an agreement does not

specify a duration for health care benefits in particular," courts "apply the general durational clause").

Plaintiffs next point to certain contribution cap clauses as evidence that the parties intended the benefits to vest beyond the expiration of the CBA. They say that "for many years the relevant CBAs had Cap Clauses that set forth a limit on the amount of money GE would spend for union retiree medical care after the expiration of the CBA." (Brief for Appellant at 22 (emphasis omitted) (citing R. 1, Compl., PageID #9–10).) For instance, the "Cap Clause" from the 1991 PIA reads as follows:

> Consistent with the provisions of Section 7(b) of Title I, postretirement medical benefits under the 1991-1994 Agreement will remain in effect for so long as this Agreement remains in effect notwithstanding any provisions to the contrary in the applicable 1991 plans. Beginning in January of 1995, annual Company contributions for any subsequent postretirement medical benefits will continue up to the maximum of the average 1994 Company contributions per retiree multiplied by the number of retirees for such benefits.

(R. 46-8, 1991 PIA Excerpt, PageID # 902–03.) Plaintiffs characterize such provisions as "unlimited statement[s] regarding GE's obligation to fund the [Retiree Benefit] Plans beyond the term of the CBA, showing that these Plans were not intended to be terminated at the end of the CBA." (Brief for Appellant at 11.)

But notwithstanding the provision's own statement that postretirement medical benefits would continue only "for so long as this Agreement remain[ed] in effect" or the provision's explicit reference to Section 7(b) of Title I, which forbid GE to amend or terminate the Plans only until the expiration of the CBAs, this Court has rejected such reliance on contribution cap clauses to indicate vesting. In *Cole*, we held that cap clauses indicate that the parties "contemplated that retiree healthcare benefits would continue," but also that "the fact that they anticipated, or even hoped, that these benefits would continue does not mean that [the company] is bound to provide these

benefits for the life of the retirees." 855 F.3d at 701. Similarly, in *Watkins*, we recognized that "[t]here is a good reason for a company to adopt healthcare caps, even if caps take effect only far in the future: because companies must recognize as a liability on their balance sheet the present value of their anticipated future healthcare costs[.]"[3] *Watkins*, 875 F.3d at 327 (citing *Wood v. Detroit Diesel Corp.*, 607 F.3d 427, 428–29 (6th Cir. 2010)). "In any case, that the caps contemplated healthcare benefits into the future did not mean that [the company] had promised to provide benefits forever." *Id.* Finally, in *Cooper*, we recently held that "[c]ontribution caps function only as limiting provisions protecting [the company's] exposure in the event healthcare benefits continue to be provided; they do not speak to the scope of *retirees*' rights." 884 F.3d at 623 (emphasis in original).

Plaintiffs next invoke a number of provisions in the CBA that they claim tie eligibility for retiree healthcare benefits to eligibility for pensions. Specifically, they claim that "the [Retiree Benefit] Plans are intertwined with the GE lifetime pension benefit to a remarkable degree," and "the intertwined relationship between the [Retiree Benefit] Plans and the GE Pension Plans at a minimum strongly demonstrates the inherent ambiguity in the [Retiree Benefit] Plans concerning their duration." (Brief for Appellant at 38 (citing *Watkins*, 875 F.3d at 328).) But this Court has said that "*Tackett* rejected this kind of 'tying' analysis as a relic of a misdirected frame of reference, calling it one of many *Yard-Man* inferences that was 'inconsistent with ordinary principles of contract law.'" *Gallo*, 813 F.3d at 272 (quoting *Tackett II*, 135 S. Ct. at 937). We explained that

> [i]t is not surprising that CBAs address pension and healthcare benefits for retirees. And it is not surprising that the CBAs make pensioner status a condition of receiving healthcare benefits. But neither one of these features of the CBAs means that retirees will get those benefits *for as long as* they earn a pension, particularly

---

[3] Plaintiffs make a similar argument that provisions discussing "lifetime maximum benefits" also indicate vesting. This argument fails for the same reason: namely, setting lifetime maximum benefits also allows a company to appropriately valuate its liabilities.

since the pension provisions use vesting language and the healthcare provisions do not.

*Id.* (emphasis in original). Further, the Supreme Court recently explained that courts may not use "the tying of retiree benefits to pensioner status" to infer contractual ambiguity, let alone to infer vesting. *Reese II*, 138 S. Ct. at 766.

Finally, Plaintiffs argue that the "enroll at any time" and "surviving spouse" provisions indicate that the healthcare benefits are vested. Specifically, the Retiree Benefit Plans provided that eligible retirees who opt out of coverage of the Plans could "reenroll for coverage . . . at any time regardless of your health status." (R. 1, Compl., PageID # 10.) And the Plans also provided that "in the event of [a retiree's] death, [his or her] surviving spouse or eligible domestic partner will have medical care benefits available equal to the remaining balance, if any, of the amount of such benefits available to [the retiree and his or her spouse] prior to [the retiree's] death." (*Id.* at PageID # 10–11.) Neither of these provisions says anything about the duration of the benefits. Instead, the more natural reading of the re-enroll language is that it merely overrides any restrictions on re-enrolling in the Plans while the Plans are in effect. As for the surviving-spouse language, we have recently held that the express granting of "lifetime healthcare benefits [only] to surviving spouses and dependents in the CBA . . . tends to show that they knew how to provide for vested benefits and chose not to for retirees." *Fletcher*, 892 F.3d at 225. The case against inferring lifetime vesting from surviving-spouse language is even stronger here where the surviving spouses were not promised "lifetime benefits," but instead only the retirees' "remaining balance[s]." In sum, neither of these provisions is sufficient to indicate vesting under our case law and in light of the overwhelming evidence to the contrary.

**CONCLUSION**

The sheer deluge of cases that this Court has addressed since *Tackett* shows the "prevalence of lifetime benefits in unionized, manufacturing sectors of the economy, and would seem to support the contention that . . . the benefits were so pervasive and so deeply ingrained that . . . the lack of explicit language about vesting is understandable."  O'Brien Hylton, *supra*, at 366; *see Gallo*, 813 F.3d 265; *Cole*, 855 F.3d 695; *Kelsey-Hayes Co.*, 854 F.3d 862, 138 S. Ct. 1166 (2018) (*per curiam*); *Reese*, 854 F.3d 877, *vacated*, 138 S. Ct. 761 (2018) (*per curiam*); *Serafino*, 707 F. App'x 345; *Watkins*, 875 F.3d 321; *Cooper*, 884 F.3d 612; *Fletcher*, 832 F.3d 217; *Zino v. Whirlpool Corp.*, No. 5:11CV1676, 2017 WL 3219830 (N.D. Ohio July 27, 2017), *appeal docketed*, No. 17-3851 (6th Cir. Aug. 17, 2017).  The most plausible explanation for the absence of explicit vesting language in these contracts is that they were negotiated when *Yard-Man* was still the law and so the parties did not think such language was necessary.  Unfortunately for the retirees, that argument fails under our case law.  For the foregoing reasons, the district court's judgment is **AFFIRMED**.

**JANE B. STRANCH, Circuit Judge, concurring.** I concur in the majority opinion because our recent caselaw compels the conclusion that the vesting of lifetime healthcare benefits cannot be required under the collective bargaining agreements (CBAs) at issue. I write separately to express my concern about the jurisprudential path we have chosen to follow.

In *Tackett II*, the Supreme Court explained that "*Yard-Man* violates ordinary contract principles by placing a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements." 135 S. Ct. 926, 935 (2015). The Court instructed us to remedy that problem by applying "ordinary principles of contract law" rather than our own "suppositions about the intentions of employees, unions, and employers negotiating retiree benefits." *Id.* The Court did not instruct us to remedy that problem by placing a thumb on the employers' side of the scale and, because the reason to forbid the former applies equally to the latter, could not have done so. It is thus improper to replace contextual suppositions in favor of vesting with contextual suppositions opposed to vesting. Simply put, if we cannot suppose that union negotiators struck a bargain to give up wages in exchange for retiree healthcare, then we cannot suppose that employers provided decades of benefits to retirees based on a heady mixture of altruism and optimism.

Under the instructions of the Supreme Court, dismantling *Yard-Man* does not lead inevitably to dismantling the central concept that promises matter. To the contrary, perhaps the most fundamental "ordinary principle of contract law" is that, if a promise fits the definition of a contract, courts will enforce it. *See* Restatement (Second) of Contracts § 1 (Am. Law Inst. 1981) ("A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty.").

Our opinion explores in detail the written promises found in this CBA about which our previous opinions have spoken. Each case involving a CBA that includes retiree healthcare,

however, contains its own contracts and its own system of industrial self-government—its own customs or usages that inform the meaning of contract language. *See* 12 Richard A. Lord, *Williston on Contracts* § 34:3 (4th ed. 1990). In addition to the promises we address above, this Complaint alleges a telling set of promises specific to this workplace and these parties. In 2011, GE managers and human resources representatives advised union-represented employees to retire before a new CBA took effect to "make sure that they would be able to continue to participate in the Retiree Benefit Plans" under their existing terms. During the term of the 2011 CBA, hundreds of union-represented employees took a special form of early retirement that allowed for continued medical coverage, and "[e]ach of those individuals was promised continuing health benefits during her or his retirement in the form and with the benefits that were available under that collective bargaining agreement." At this stage in the litigation, we accept those factual allegations as true and construe them in the light most favorable to the plaintiff. *Haviland v. Metro. Life Ins. Co.*, 730 F.3d 563, 566–67 (6th Cir. 2013). We therefore assume that GE affirmatively promised continuing healthcare benefits to many retirees. No one involved in this litigation even contends that GE fulfilled those promises.

Broken promises matter. They matter in ordinary contract law, and they matter in ERISA law. Congress passed ERISA precisely because retirees were not receiving the benefits they had been promised; the most famous such instance, often cited as a catalyst for the passage of ERISA, was "the economic collapse of the Studebaker-Packard Corporation, an event that left many terminated employees without their *promised* pensions." *Tullis v. UMB Bank, N.A.*, 515 F.3d 673, 679 (6th Cir. 2008) (emphasis added); *see also* James A. Wooten, *"The Most Glorious Story of Failure in the Business": The Studebaker-Packard Corporation and the Origins of ERISA*, 49 Buff. L. Rev. 683 (2001). Because ERISA polices employers' broken promises, courts interpreting

ERISA must ensure that employees who relied on broken promises are not without recourse. Thus, for example, employers distributing information about plan coverage must discharge their duties as fiduciaries. *See James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 455 (6th Cir. 2002). As the Supreme Court has explained, "[t]o participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense is not to act 'solely in the interest of the participants and beneficiaries.'" *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996) (quoting 29 U.S.C. § 1104(a)(1)). And because duties under ERISA "draw much of their content from the common law of trusts," *id.* at 496, we have recognized that principles of equitable estoppel may operate to hold employers to their promises if employees reasonably rely to their detriment on those misrepresentations. *See Smiljanich v. GMC*, 302 F. App'x 443, 449–51 (6th Cir. 2008); *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1300 (6th Cir. 1991).

Despite this law, we have taken a jurisprudential path that makes it exceedingly difficult, if not impossible, to reach the factual evidence of promises made—evidence that often shows an employer's clear and consistent promises to its employees that they and their families will receive lifetime healthcare. These are promises upon which employees and their families planned and budgeted their lives and retirements, as did the GE employees here who gave up their jobs and accepted a special early retirement package for the very purpose of guaranteeing themselves lifetime healthcare—benefits that they will now not receive. That result and the path that led us here should sit uneasily with all of us.

In our haste to correct *Yard-Man*'s error, we should not assume that the harsh result our precedent requires for these retirees need be the outcome in every case. Our cases must remain consistent with Justice Ginsburg's directive that "no rule requires 'clear and express' language in order to show that parties intended health-care benefits to vest." *Tackett II*, 135 S. Ct. at 938

(Ginsburg, J., concurring). And we must remain consistent with our own adoption of the Supreme Court's determination not "to adopt an 'explicit language' requirement in favor of companies." *Tackett III*, 811 F.3d 204, 209 (6th Cir. 2016).

Though we continue to reiterate that CBAs may be ambiguous as to vesting, we have yet to definitively identify an ambiguity or even contract language that marks one. Moving forward, we will inevitably be called upon to do so—and the Supreme Court has hinted at where we might find guideposts. In *Reese II*, the Supreme Court found it "[t]elling[]" that "no other Court of Appeals would find ambiguity in these circumstances." 138 S. Ct. 761, 766 (2018). So just as we have looked to our sister circuits for guidance on what is *not* ambiguous, *see, e.g.*, *Gallo v. Moen Inc.*, 813 F.3d 265, 271 (6th Cir. 2016), we may look to them for examples of what *is* ambiguous. To give just one example, both the Ninth and the Fourth Circuits found ambiguity where a CBA linked eligibility for a benefit "to an event that would almost certainly occur after the expiration of the agreement." *Alday v. Raytheon Co.*, 693 F.3d 772, 785 (9th Cir. 2012); *Quesenberry v. Volvo Trucks N. Am. Retiree Healthcare Benefit Plan*, 651 F.3d 437, 441 (4th Cir. 2011). We should not rush headlong past mile markers set up by our sister circuits. Nor should we further define the path of our jurisprudence in a way that fails to give heed to either the principles of contract law that seek to enforce promises made or the principles of ERISA that command us to honor the fundamental duties of the law of trusts.

**LARSEN, Circuit Judge, concurring in part and concurring in the judgment.**  The Supreme Court has repeatedly reminded this court to apply ordinary principles of contract interpretation when deciding whether a collective bargaining agreement vests healthcare benefits for life.  *See M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 930 (2015); *CNH Indus. N.V. v. Reese*, 138 S. Ct. 761, 762 (2018) (per curiam).  The majority appropriately applies these ordinary principles in Parts 2 and 3 of its Analysis.  I, therefore, concur in those parts of the opinion and in the judgment.